In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2471

MOHAMADOU L. TANDIA,

*Petitioner*,

*v.*

ALBERTO GONZALES,

*Respondent*.

———————

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A79-572-527

———————

ARGUED FEBRUARY 28, 2007—DECIDED MAY 23, 2007

———————

Before RIPPLE, MANION and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge.*  Mohamadou Tandia petitions for review of the order of the Board of Immigration Appeals ("BIA" or "Board") denying his applications for asylum, withholding of removal and relief under the Convention Against Torture ("CAT") and ordering his removal from the United States. Mr. Tandia claimed that he suffered persecution in his home country of Mauritania and feared future persecution if he were forced to return. The immigration judge ("IJ") determined that Mr. Tandia's account of his two arrests and detentions was uncorroborated and not credible. Mr. Tandia now contends that the IJ's cred-

ibility determination was erroneous and that he has
demonstrated past persecution and a well-founded fear of
future persecution. Because we conclude that the IJ's
credibility determination indeed was flawed and that the
overall decision is not supported by substantial evidence,
we grant the petition for review and reverse the decision
of the Board.

# I

## BACKGROUND

Mr. Tandia left Mauritania in June 2001 and was admit-
ted to the United States on a sixth-month visa. He applied
for asylum within weeks of his arrival. In April 2002, he
was served with a notice to appear that charged him with
removability for overstaying his six-month visitor's visa.
He conceded removability and requested, in addition to
asylum, withholding of removal and CAT relief. He
claimed past persecution and a fear of future persecution
on the basis of his race (black), ethnicity (Soninke tribe) and
political opinion, including his membership in an opposi-
tion party, the United Democratic Front, *Union des Forces
Démocratiques* ("UFD"), and his resistance to the imposition
of Arabic as the official language in Mauritanian schools.

After a hearing on the merits of the application in May
2003, the IJ denied all forms of relief because he believed
that Mr. Tandia's testimony was not credible. However,
Mr. Tandia successfully challenged the accuracy of the
translation at that hearing, and a second hearing was held
in June 2004. The IJ, sitting in Chicago, conducted the
hearing by teleconference; Mr. Tandia, his attorney and an
interpreter were in Kansas City, Missouri.

At the second hearing, Mr. Tandia testified primarily about his political activity, which began when, at the age of nineteen, he became a member of the UFD to oppose "laws that were against the people." A.R. at 229; *see also id.* at 109, 227-29. The UFD is a major opposition party in Mauritania and has been banned by the government. According to Mr. Tandia, the government persecuted him for his political activities on two occasions. First, in January 1994, Mr. Tandia and several other students organized a demonstration to protest the cessation of French-language instruction in public schools. Approximately 100 students gathered outside the high school in Kaeda. Mr. Tandia and the other leaders of the rally, about 10 to 15 people, were arrested and taken to a detention facility outside the city, where they were held for eight weeks. During that time, they were interrogated "every day," *id.* at 238, denied sufficient food and water and subjected to extreme heat, *id.* at 393. The guards regularly beat the students with sticks, belts, branches and their fists. Mr. Tandia stated that he suffered "injuries on my face, my back, my belly, my fingers, my arms." *Id.* at 238. Mr. Tandia and the other students never were charged with any crime or allowed to consult with lawyers. After eight weeks, the students were forced to promise not to engage in any further public opposition to the government, and they were released.

The second incident Mr. Tandia described occurred years later, after he had abstained from political activity for a number of years following his detention and beating. However, after leaving his public high school, where classes were taught only in Arabic, he organized another group to protest the high tuition and Arabic-language instruction in the public schools. Mr. Tandia later enrolled in a private school where he received instruction in French

instead of Arabic. In August 2000, Mr. Tandia and the rest of the students in his class at the private school (about 15) were arrested. According to Mr. Tandia, the reason for the arrests was that "we would not stay in the public schools and be forced to learn in Arabic as opposed to French." *Id.* at 394. Although he was not beaten, Mr. Tandia suffered "mental abuse" and was detained for about four months. *Id*. He was not released until after the national Baccalaureate exam had been administered. Without passing that exam, Mr. Tandia could not continue with his education and, consequently, would be limited in his further intellectual and professional pursuits.

Mr. Tandia testified that in December 2000, shortly after he was released from detention, he paid a bribe and obtained a passport and visa. He crossed the border to Senegal, and from there he traveled to the United States.

Mr. Tandia's family members corroborated his testimony. His uncle, Bocar Tandia, who received asylum in the United States after leaving Mauritania in 1992, testified at the hearing. He stated that, like Mr. Tandia, he was involved in the UFD, "the main political opposition there in Mauritania fighting against the corrupted regime." *Id.* at 279. According to Bocar, from 1989 to the present, many black Africans, such as members of the Soninke tribe, experienced "problems" in Mauritania. *Id.* at 280. Bocar testified that, if Mr. Tandia returned to Mauritania, he would be denied basic rights as a citizen, including education. Mr. Tandia also submitted an affidavit from a cousin, Issaka Tandia, who corroborated his membership in the UFD and opined that Mr. Tandia was "in danger of being persecuted . . . arrested, imprisoned, and possibly even killed" due to his politics and his race. *Id.* at 315. Issaka and another cousin who submitted a letter on Mr. Tandia's behalf have been granted asylum in the United States.

The IJ denied Mr. Tandia's requests for relief from removal. The IJ believed that Mr. Tandia's credibility was "lacking on several factors." *Id.* at 65. First, the IJ found, Mr. Tandia provided inconsistent testimony about the year he had transferred from public school to private school and the year he had resumed political activity after his detention in 1994. Second, the IJ found implausible one of the reasons Mr. Tandia had given for fearing removal to Mauritania, namely, that he could be punished for leaving the country based on his opposition to the government. The IJ concluded that this statement was not credible because the government had given Mr. Tandia "permission to leave the country" in the form of a passport. *Id.* at 66. Finally, the IJ stated that Mr. Tandia's reasons for fearing a return to Mauritania were "vague and unconvincing" and differed from his uncle's testimony on the subject. *Id.* Mr. Tandia testified that he would be persecuted "because he is a member of the opposition party, he is Soninke, he participated in demonstrations, and he transferred to a private school"; Bocar, on the other hand, testified that Mr. Tandia's "rights as a citizen would be infringed as the government would force him to learn the Arabic language and culture." *Id.*

In addition to doubting Mr. Tandia's credibility, the IJ determined that he had failed to corroborate his testimony. The IJ noted that the State Department's Country Reports for Mauritania painted a somewhat grim picture of life there for those of Mr. Tandia's race, tribe and political affiliation, but concluded that Mr. Tandia nevertheless lacked specific evidence to corroborate his political activity or his arrests. The IJ denied all forms of relief, and the BIA affirmed without opinion.

**II**

**DISCUSSION**

Where, as here, the BIA summarily affirms the IJ's decision, we review the IJ's decision as the final agency determination. *See Ayi v. Gonzales*, 460 F.3d 876, 880 (7th Cir. 2006). Our review is deferential; we will reverse the IJ's findings that Mr. Tandia was not credible, had not suffered past persecution and did not establish a well-founded fear of future persecution only if we determine that they are not supported by substantial evidence. *See Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004). Although Mr. Tandia's opening brief in this court mentions his claims for withholding of removal and CAT relief, he does not set forth any arguments in support of these claims, so they are waived. *See Balliu v. Gonzales*, 467 F.3d 609, 614 (7th Cir. 2006).

Mr. Tandia first submits that the IJ's credibility determination is flawed because it rests on a few minor inconsistencies that do not undermine his testimony that, on two occasions, he was arrested and detained for a long period of time and that he was beaten frequently during the first detention. An IJ's credibility determination generally is entitled to deference, but it must be supported by specific, cogent reasons that bear a legitimate nexus to the finding, and it cannot rely on trivial details or easily explained discrepancies. *See Ayi*, 460 F.3d at 880; *Lhanzom v. Gonzales*, 430 F.3d 833, 843 (7th Cir. 2005).

We agree with Mr. Tandia that the IJ's reasons for discrediting his testimony concern only insignificant details in the account he gave of his persecution. The first two inconsistencies relied upon by the IJ concern dates: when Mr. Tandia transferred to private school and when

he reengaged in public political activity after being detained and beaten in 1994. Indeed, Mr. Tandia's written statement and oral testimony diverge on these points: In his written account, Mr. Tandia stated that he transferred to private school "in January of 1998," A.R. at 394; at the hearing, Mr. Tandia stated at least four times that he began private school in 2000. *Id.* at 248, 264, 273, 275-76. When confronted about the discrepancy, Mr. Tandia explained that he had not enrolled immediately in private school after leaving public school because he had to "repeat some classes" before he could begin his senior year at the private school. *Id.* at 275-76. Rather than evaluate this explanation, the IJ ignored it, and concluded instead that the discrepancy in the dates rendered Mr. Tandia an incredible witness.[1] Notably, the central points of Mr.

_____

[1] We are reluctant to place much weight on the inconsistency between Mr. Tandia's written and oral statements on this matter because we note that this is one of the many areas of testimony that is difficult to understand from the transcript. After the interpreter initially did not understand Mr. Tandia's answer to the question "Were you doing these review classes during 1998 and 1999?", A.R. at 275, Mr. Tandia repeated his answer, which appears in the transcript as: "If I hadn't done these classes, they would not have given me the (indiscernible) or the paper that (indiscernible) you have to have to have the right level, then I could get up to the senior classes of the private school." *Id.* at 276. This response is typical of the testimony on the timing of Mr. Tandia's education and political activities, and we find it striking that the IJ attached so much weight to testimony that is barely coherent. This is just one example of the lack of clarity we observed in the transcript of the second hearing. For example, the interpreter admitted several times that he could not understand Mr. Tandia's responses, *id.*

(continued...)

Tandia's testimony were consistent: that the government enacted Arabic-only instruction in the public schools and that Mr. Tandia changed schools so that he could continue his lessons in French. *See San Kai Kwok v. Gonzales*, 455 F.3d 766, 769 (7th Cir. 2006) (holding that the IJ erroneously discredited an alien who "confused the dates but consistently identified" details of the underlying events); *Hanaj v. Gonzales*, 446 F.3d 694, 700 (7th Cir. 2006) (holding that the IJ erroneously discredited the petitioner based on details when the alien's description of "the acts forming the basis of his persecution claim" was consistent). Indeed, the transcripts Mr. Tandia placed in the record support his testimony that he transferred to private school, and the State Department Report confirms that bilingual education ended around this time.

The date on which Mr. Tandia resumed political activities is also insignificant because he consistently testified that his arrest for that activity occurred in August 2000, that he was arrested with a number of his classmates and that he was detained for four months. *See San Kai Kwok*, 455 F.3d at 769; *Hanaj*, 446 F.3d at 700. Moreover, the statement in his affidavit that he started to organize opposition to the government's education policies in 1998 is not inconsistent with his hearing testimony that he was arrested and detained for such activity in 2000.

---

[1] (...continued)
at 230, 232, 243, 271, 275, and Mr. Tandia's translated testimony is peppered with the notation "indiscernible," *see, e.g., id.* at 107-09, 228-31, 244-45. At times, Mr. Tandia himself attempted to correct what he believed was incorrect translation. *Id.* at 230, 257.

The IJ's next reason for discrediting Mr. Tandia also is not supported by the record. The IJ found it implausible that the government might, as Mr. Tandia testified, persecute him because, among other reasons, he left the country; the IJ justified this opinion on the ground that the government would not have given Mr. Tandia a passport if that were the case. As Mr. Tandia points out, however, he had testified that he obtained his passport through bribery; therefore, the issuance of a passport did not indicate official approval of his plans. The IJ's inference that the Mauritanian government approved of Mr. Tandia's departure is not based on evidence in the record, but is based on speculation and conjecture. We cannot uphold such a finding. *See Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005).

The IJ's final reason for discrediting Mr. Tandia rests on testimony that the IJ summarily described as "vague and unconvincing." The IJ seems to suggest that Mr. Tandia and his uncle gave different reasons for why Mr. Tandia should fear future persecution, but no inconsistency is evident between Mr. Tandia's testimony and that of his uncle. Mr. Tandia listed a number of reasons he expected mistreatment—his political party, his race, his tribe. His uncle added some detail about the rights of citizenship Mr. Tandia would be denied as a result of Mr. Tandia's membership in those persecuted classes. This illusory inconsistency is insufficient to discredit Mr. Tandia's testimony wholesale because, like the other reasons for the adverse credibility determination, it is unrelated to Mr. Tandia's central claim that he was twice arrested without cause and detained. *See Hanaj*, 446 F.3d at 700. The IJ never addressed whether the events Mr. Tandia described could amount to past persecution; instead, he focused on insignif-

icant details. In sum, the IJ's credibility determination suffers from "factual error, bootless speculation, and errors of logic." *See Pramatarov v. Gonzales*, 454 F.3d 764, 765 (7th Cir. 2006) (collecting cases).

The IJ also determined that, because Mr. Tandia was not a credible witness, his testimony alone did not suffice to meet the burden of proof in establishing eligibility for asylum. The IJ, therefore, looked to the corroborating evidence Mr. Tandia provided in support of his claims, and, finding it lacking, concluded that his request for asylum must be denied. Mr. Tandia challenges this latter finding; specifically, he contends that his claims are corroborated by evidence such as his UFD membership card, his school transcripts, his uncle's testimony and the country reports that support his description of conditions in Mauritania. Mr. Tandia further suggests that corroboration was unnecessary because the IJ never discredited his testimony regarding his arrests, detentions and beating.[2]

We note that, if, on remand, the IJ concludes that Mr. Tandia is a credible witness, his testimony, standing alone and without the aid of corroborating evidence, may establish his eligibility for asylum. *See* 8 C.F.R. 208.13(a); *Dawoud v. Gonzales*, 424 F.3d 608, 612 (7th Cir. 2005). Our conclusion that the asserted bases for the finding of incredibility cannot stand, however, necessarily does not render Mr. Tandia a "credible" witness. Rather, the IJ must

---

[2] We note, however, that although it is true that the IJ never mentioned Mr. Tandia's testimony about the events that formed the basis of his claims, the IJ discredited Mr. Tandia's testimony as a whole, not just the specific areas of testimony that the IJ found inconsistent.

reexamine his conclusion regarding credibility before turning afresh to the issue of corroboration.

As we have stated, before an IJ may deny a claim for lack of corroboration, the IJ must (1) make an explicit credibility finding; (2) explain why it is reasonable to expect additional corroboration; and (3) explain why the alien's explanation for not producing that corroboration is inadequate. *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006); *Diallo v. Gonzales*, 439 F.3d 764, 765-66 (7th Cir. 2006); *Hussain v. Gonzales*, 424 F.3d 622, 629 (7th Cir. 2005). Had the IJ's ruling rested on a conclusion that additional corroborating evidence was available, but had not been provided, we would be constrained in our review by § 101(e) of the REAL ID Act; that section requires us to accept "a determination made by a trier of fact with respect to the availability of corroborating evidence" unless a reasonable trier of fact would be "compelled to conclude that such corroborating evidence is unavailable."[3] Emer-

---

[3] We note, for clarity, that the REAL ID Act made two changes to existing law on the issues of credibility and corroboration. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Division B—REAL ID Act of 2005, Pub. L. No. 109-13, § 101, 119 Stat. 231, 302-05 (codified at 8 U.S.C. §§ 1158(b)(1)(B)(ii), 1231(b)(3)(C), 1252(b)(4)). First, it constrains our review of an IJ's determination regarding the availability of corroborating evidence, as discussed above. REAL ID § 101(e) (amending 8 U.S.C. § 1252(b)(4)). This provision applies to all cases, regardless of the date of filing. *Id.* § 101(h)(3).

A closely related provision of REAL ID found in § 101(a)(3) amends the standards contained in 8 U.S.C. § 1158(b)(1) for determining whether an asylum applicant has satisfied his

(continued...)

gency Supplemental Appropriations Act for Defense, the
Global War on Terror, and Tsunami Relief, Division
B—REAL ID Act of 2005, Pub. L. No. 109-13, § 101(e), 119
Stat. 231, 305 (codified at 8 U.S.C. § 1252(b)(4)); *see also
Ikama-Obambi*, 470 F.3d at 724-25. Our review of the IJ's
decision in this case, however, reveals that the IJ made no
explicit finding regarding the availability of additional
corroborating evidence; his determination was only that
Mr. Tandia, who the IJ had determined had not testified
credibly, had failed to satisfy his burden of proof because
he had failed to provide sufficient corroborating evidence.

As this court's recent decisions make clear, however, the
IJ must address the reasons offered by an alien for failing
to provide the specific pieces of documentation that the
IJ deems necessary to sustain the alien's burden of proof.
*Id.* at 725; *Hussain*, 424 F.3d at 629; *Diallo*, 439 F.3d at 765-
66; *see also Diallo v. INS*, 232 F.3d 279, 290 (2d Cir. 2000)
("[I]n the absence of . . . an assessment of the petitioner's
reasons for his failure to produce further corroboration . . .
[the IJ's] ultimate ruling cannot stand.") (quoted in
*Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004)).
Here, the IJ's decision on the lack of corroboration never
addressed the explanations that Mr. Tandia offered for

---

[3] (...continued)
burden of proof in applications filed on or after the date of
enactment of the Act (May 11, 2005), *see* § 101(h)(2); it notes that
an IJ may require an otherwise credible applicant to provide
corroborating evidence in support of his claim, unless it
cannot reasonably be obtained. Because Mr. Tandia's applica-
tion was filed before May 11, 2005, it did not apply to Mr.
Tandia's proceedings before the IJ. *See Ikama-Obambi v. Gonzales*,
470 F.3d 720, 725 & n.2 (7th Cir. 2006).

the absence of the documentation the IJ wanted. For example, the IJ faulted Mr. Tandia for failing to corroborate his testimony "that he was the leader of the 1994 demonstration, that he was arrested and imprisoned in 1994 and 2000, or that he sustained bodily injury from government officers." A.R. at 67. Mr. Tandia had explained, however, that he could not document his arrests because he was never charged with any crime and because he could not approach anyone in government to verify his story. This explanation is bolstered by record evidence that baseless arrests and prolonged imprisonments of political prisoners, including students, occur in Mauritania. The IJ never addressed Mr. Tandia's explanation for the lack of other documentation. The IJ also failed to address Mr. Tandia's explanation that he never sought medical treatment for the injuries he suffered during the first arrest because he was afraid of seeking treatment at a government hospital, and so he took advantage of "[t]raditional medicine that you practice inside the family." *Id.* at 241.

In addition to failing to acknowledge Mr. Tandia's explanation for the absence of certain evidence, the IJ gave short shrift to the supporting documentation Mr. Tandia did provide. For example, Mr. Tandia provided a copy of his UFD membership card, and the State Department Reports on Human Rights Practices confirm his testimony that the UFD was among the few opposition parties banned by the government. Also, the oral testimony of Bocar Tandia and the affidavit from Issake Tandia corroborate Mr. Tandia's involvement in the UFD. Furthermore, the documents in the record prepared by the State Department and various human rights organizations lend credence to Mr. Tandia's claims to the extent that they document arbitrary arrests, prolonged

detentions of political prisoners, and the " 'Arabization' in the schools and in the workplace" at the expense of other citizens. A.R. at 311; *see also id.* at 300-11, 483.


**Conclusion**

Because the IJ discredited Mr. Tandia based on trivial inconsistencies and failed to support the conclusion that Mr. Tandia's testimony was not corroborated by evidence in the record, we grant the petition for review and reverse the order of the Board of Immigration Appeals.

PETITION FOR REVIEW GRANTED;
REVERSED AND REMANDED


A true Copy:

     Teste:


_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*