In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3265

EJIGU TADESSE,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A96 139 339.

ARGUED MAY 29, 2007—DECIDED JULY 9, 2007

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Ejigu Tadesse was living in Italy in 1998 when war broke out between Eritrea and her home country of Ethiopia. After a cease-fire was declared in 2000, she attempted to return home in order to discover what had become of her family, who lived near the border separating the two countries and with whom she had lost all contact. Ethiopian policemen apprehended her at the airport and accused her of being an Eritrean spy because she is half ethnically Eritrean on her father's side. She contends that they severely beat her, and that two of them raped her. The officers then ordered her to leave the country. She returned to Italy and then came to the United States seeking asylum. The immigration judge

denied the application and other relief, finding that the Ethiopian deportation order that Tadesse included in her application was fraudulent; the IJ also found Tadesse's testimony implausible and inconsistent. The Board of Immigration Appeals affirmed on similar grounds, and Tadesse petitioned this court for review.

We grant the petition for review. The IJ never gave Tadesse an opportunity to rebut the government's expert testimony regarding the deportation order, and wrongfully disregarded Tadesse's corroborating evidence. Moreover, the IJ's treatment of the case demonstrates a troubling disregard for the situation in Ethiopia at the time of Tadesse's ordeal. The case is remanded to the BIA for further proceedings.

## I. BACKGROUND

The 1998-2000 war between Ethiopia and Eritrea arose over a border dispute and led to tens of thousands of deaths on each side. Critically for our consideration, the war also involved mass deportations. The government of Ethiopia deported some 75,000 Eritrean nationals and Ethiopians of Eritrean ethnicity during the conflict. A cessation of hostilities was implemented in June 2000 and monitored by a United Nations peacekeeping force, and the mass deportations stopped at that time. The parties signed a comprehensive peace accord in December 2000.

Tadesse's November 2000 ordeal at the Ethiopian airport occurred between the cessation of hostilities in June and the final peace in December. After her release, she learned that her father, brother, and sister had been deported to Eritrea; that her mother's and husband's whereabouts were unknown; and that her family's home and business had been confiscated by the government and

sold at auction. Although she was ordered to depart from Ethiopia within eight days, she sought medical treatment and recuperated at the home of a family friend for two months before leaving the country.

At Tadesse's immigration hearing, the government sought and obtained a continuance in order to send the Ethiopian deportation order to the Department of Homeland Security's Forensic Document Laboratory (FDL) in Virginia for analysis. On the day of the continued hearing, the government provided Tadesse with a one-page FDL report that had been prepared and submitted to the government approximately six months earlier by document expert Dorothy Held, whom the government sought to have testify by telephone. Tadesse objected, stating that she should have been given an opportunity to study the report in advance of the hearing, but the IJ refused to grant a continuance. The IJ stated, however, "If you request, at the conclusion of the hearing today, the opportunity to present your own expert, to rebut anything presented, I would grant you a continuance for that purpose." The IJ also accepted the affidavit of Saule Buzaite, Tadesse's therapist at the Marjorie Kovler Center for the Treatment of Survivors of Torture, and sent home Buzaite—who was prepared to testify—stating that she could be recalled if "something comes up."

Document examiner Held testified consistent with her report that the Ethiopian deportation order, a form that has spaces where the individual's name and identification number are to be hand-written in, "is probably not a valid issuance." The document on which Tadesse's name was written in was a photocopy with a photocopied seal rather than an original with its own seal. Held opined that it was therefore not authentic: "[T]he appearance of a genuine wet seal impression, is a bench mark of a genuine document. This is not country specific. All documents on which wet seals are used as certifying indicia

must have an original wet seal. If it does not, it is not a valid issuance." Despite this categorical statement that all photocopied seal-bearing documents issued anywhere in the world are automatically phonies, on cross-examination Held conceded that she did not have a sample of an Ethiopian deportation order with which to compare the document, although she did have an Ethiopian birth certificate issued by the same office. Tadesse's counsel then questioned Held on the context in which the deportation order had been issued—specifically, between interim and final peace accords ending a war that had involved mass deportations of ethnic Eritreans like Tadesse from Ethiopia. Counsel asked whether Held was aware that tens of thousands of deportation orders had been issued very recently, but Held replied that this was beyond her expertise. Counsel then asked whether, "assuming many of them were issued, very quickly, as part of a government policy, trying to get people out of the country quickly, is it possible that they were done differently than other documents would have been done?" The IJ sustained the government's objection to the question as calling for speculation.

At the end of the hearing Tadesse did request a continuance to put on her own expert to rebut Held's testimony, and the IJ granted the request. Nevertheless, at the next continued hearing the IJ refused to accept the affidavit or testimony of Tadesse's expert, Professor Donald N. Levine, an eminent scholar of Ethiopian politics and culture at the University of Chicago who has written two books and dozens of academic articles about Ethiopia. The IJ stated:

> [Y]ou're attempting to bolster your case in chief under the guise of rebutting FDL testimony. And there's nothing in this affidavit that leads me to conclude that this professor, while certainly well qualified and, you know, knowledgeable of the situation in Ethiopia, I don't see anything here

that would qualify him as an expert as to issuance of documents. That's really the heart of your rebuttal right now, and this isn't—this doesn't address it, so I'm not going to allow it.

The IJ went on to deny the application for asylum and other relief based on the allegedly fraudulent document and various aspects of the testimony which she considered implausible or inconsistent with Tadesse's asylum application. The BIA affirmed, echoing the IJ's stated reasons.

## II. ANALYSIS

Since the BIA issued its own opinion, we review that decision rather than the IJ's directly. *See Agbor v. Gonzales*, No. 06-2015, 2007 WL 1518522, at *2 (7th Cir. May 25, 2007). Tadesse can demonstrate that she is a refugee, and hence eligible for asylum, by showing that she is unable or unwilling to return to Ethiopia because of persecution or a well-founded fear of persecution on account of her race, religion, nationality, membership of a particular social group, or political opinion. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). (Ethnic Eritreans living in Ethiopia constitute a distinct social group. *See Negeya v. Gonzales*, 417 F.3d 78, 83 (1st Cir. 2005).) We review the BIA's decision under the deferential substantial evidence test, and will affirm an adverse credibility finding so long as it is supported by specific, cogent reasons that bear a legitimate nexus to the finding. *Ayi v. Gonzales*, 460 F.3d 876, 880 (7th Cir. 2006).

The BIA, like the IJ, discredited Tadesse based on three types of findings: (1) her use of a "fraudulent" document; (2) "implausible" aspects of her testimony; and (3) "inconsistencies" between her testimony and asylum application. Moreover, the IJ placed very little weight on the

affidavit from Tadesse's torture counselor and the BIA approved this decision. We examine these matters in turn.

## A.  Ethiopian deportation order controversy

Tadesse contends that she was deprived of due process, or at least the protections set out in 8 U.S.C. § 1229a(b)(4)(B),[1] by the IJ's handling of the Ethiopian deportation order. First, she contends, she was given insufficient notice of the government expert's conclusions when she was provided a copy of Held's report on the day of her hearing. Second, she argues that the IJ arbitrarily barred her from presenting material evidence on her behalf by refusing to allow her to rebut Held's testimony and report.[2]

Tadesse was entitled to a reasonable opportunity to examine adverse evidence and to prepare for cross-examination. *See* § 1229a(b)(4)(B); *Al Khouri v. Ashcroft*, 362 F.3d 461, 464-67 (8th Cir. 2004). Receiving key evidence on the day of the hearing seems to fall well short of this standard, although the IJ may have righted the situation by giving Tadesse a continuance to rebut document

---

[1]  "[T]he alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government."

[2]  Tadesse also argues that Held was not qualified to present expert testimony under *Pasha v. Gonzales*, 433 F.3d 530, 535 (7th Cir. 2005). While this argument has merit—Held did not have a copy of an Ethiopian deportation order with which to compare Tadesse's, and, if her curriculum vitae is any indication, does not appear to speak Amharic, the language in which the document is written—Tadesse did not raise it to the Board and hence we cannot consider it. *See Pjetri v. Gonzales*, 468 F.3d 478, 481 (7th Cir. 2006).

examiner Held's findings. *See Zaidi v. Ashcroft*, 377 F.3d 678, 682 (7th Cir. 2004) (three weeks to prepare for oral hearing not insufficient); *Nyama v. Ashcroft*, 357 F.3d 812, 816-17 (8th Cir. 2004) (per curiam) (petitioner not "ambushed" by evidence introduced on day of hearing where evidence not actually admitted until six months later).

Of course, at the subsequent hearing the IJ refused to consider Professor Levine's affidavit or testimony. This was a violation of Tadesse's right to present evidence on her own behalf, for an IJ may not bar whole chunks of material evidence favorable to the petitioner. *See Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 538-40 (7th Cir. 2005); *Niam v. Ashcroft*, 354 F.3d 652, 659-60 (7th Cir. 2004); *Kerciku v. INS*, 314 F.3d 913, 918-19 (7th Cir. 2003) (per curiam). The IJ's reasoning—that only the testimony of another document expert could rebut Held's conclusions—is flawed. Two matters were potentially at issue concerning the Ethiopian deportation order: (1) whether it was a photocopied document; and (2) whether the Ethiopian government might have used a photocopied deportation order in November 2000. Matter one is the province of a document expert; matter two could just as easily be the province of a political expert. Tadesse has conceded from the beginning the first point—that the document is photocopied—so all that was in dispute is point two. Held stated that any photocopied seal-bearing document, no matter where it is issued, is necessarily a phony, despite acknowledging her own ignorance of country conditions in Ethiopia. But when Tadesse's counsel tried to pin Held down and ask whether such documents might be used in a war zone involving mass deportations—a notion that strikes us as quite plausible—the IJ sustained an objection by the government that the question called for speculation. So on the question most critical to Tadesse's fate—whether a photocopied

deportation order might have been issued to effect her removal from Ethiopia—the record contained no evidence at all.

Dr. Levine spoke directly to this point in his proffered affidavit, and his conclusion was based on his understanding of the situation in Ethiopia at the time:

> I find it entirely plausible that the prison officers served Ms. Tadesse with a mass-produced, as opposed to individually-prepared, document ordering her deportation under her release from detention. The chaotic conditions in which the deportations took place, compounded by the illiteracy and near-illiteracy of many low-level government employees, could very likely have led in many cases to blanket authority to effect deportations.

It was arbitrary of the IJ to reject this evidence, which was directly on point and went to the very heart of Tadesse's claim. The error was prejudicial, as it had the potential to affect the outcome of the proceedings. *See Boyanivskyy v. Gonzales*, 450 F.3d 286, 294 (7th Cir. 2006).

## B. "Implausible" testimony

The IJ also based her negative credibility finding on what she believed to be implausible aspects of Tadesse's narrative. The IJ's main point—a point that the BIA specifically blessed—was that since the Ethiopian government stopped deporting ethnic Eritreans by the thousands after the June 2000 cease-fire, Tadesse's claim to have been excluded in November 2000 was unbelievable. We do not see how barring one ethnic Eritrean from returning to Ethiopia is inconsistent with ceasing mass deportations of ethnic Eritreans several months earlier, especially when ethnic Eritreans continued to face intense persecution after the war's end. According to a May 2001 report

in the record by the former Immigration and Naturalization Service, "the peace process has not fundamentally changed the situation of people of Eritrean origin in Ethiopia."

Moreover, substantial evidence in the record suggests that even after the June cease-fire, ethnic Eritreans had difficulty reentering the country. The 2001 State Department Country Report on Human Rights Practices notes that "Eritreans and Ethiopians of Eritrean origin have been able to obtain exit visas but often are not permitted to return to the country." The 2001 INS report states that "[m]any [ethnic Eritreans] have had their passports confiscated and been denied exit visas to leave Ethiopia or been given a single exit visa with no right of return to Ethiopia." Indeed, the issue of removing ethnic Eritreans remained a hot topic in Ethiopian politics well beyond the 1998-2000 war: the same INS report notes that in March 2001, roughly half of the ruling political party's central committee members resigned in protest because they wanted to continue a formal policy of expulsion. Federal case law also shows that ethnic Eritreans in Ethiopia have continued to be stripped of their citizenship or denied re-entry into the country. *See Haile v. Gonzales*, 421 F.3d 493 (7th Cir. 2005); *Mengistu v. Ashcroft*, 355 F.3d 1044 (7th Cir. 2004). So do press accounts. *See* "Split by a Pointless War," The Economist, Sept. 19, 2002, at 45 (noting that the border dispute was not resolved until April 2002, that "[f]amilies that were split up cannot easily reunite, because the border remains closed," and that a man who is half Ethiopian and half Eritrean is not welcome in Ethiopia and is regularly accused of being a spy).

The other implausibilities noted by the IJ are similarly unsupported by substantial evidence. For instance, the IJ disbelieved that Tadesse preferred to seek asylum in the United States rather than Italy, a country that was quite

familiar to her. But Tadesse explained that after she returned to Italy from Ethiopia in early 2001, members of the Eritrean community there distrusted her and treated her as an Ethiopian spy. She also was able to obtain lodging from a friend in America. The IJ tossed aside this explanation, calling it "highly dubious given that the respondent did not clearly explain why the entire Eritrean community of Italy thought she was a spy." It is unclear why the entire country had to turn against Tadesse in order for her decision to leave to be considered plausible.

## C.  Inconsistencies were insignificant

We have held repeatedly that inconsistencies that are easily explained or concern trivial matters cannot support an adverse credibility finding. *See, e.g., Tandia v. Gonzales*, No. 06-2471, 2007 WL 1487407, at *3 (7th Cir. May 23, 2007); *San Kai Kwok v. Gonzales*, 455 F.3d 766, 769-79 (7th Cir. 2007). Yet the BIA approved the IJ's detection of inconsistencies on such insignificant details as whether or not Tadesse completed hairdressing school in Italy before returning to Ethiopia in 2000. The IJ also perceived an inconsistency between Tadesse's application, where she stated that she was "expelled" from Ethiopia, and her testimony: "She did not say that she was 'expelled' from Ethiopia; rather she left Ethiopia on her own two months after the rape." We cannot agree with the IJ that being ordered to leave in eight days but waiting two months to do so is leaving of one's own free will. More to the point, Tadesse stated in both her application and her testimony that the deportation order told her to leave within eight days. Whether she characterized that on one occasion but not another as being "expelled" is irrelevant.

Two other points concern more substantial matters. First, the IJ contended that Tadesse never proved her

Eritrean ethnicity, noting that the State Department report "indicates that in previous years, the Ethiopian government has issued most Eritreans and Ethiopians of Eritrean origin identification cards noting their Eritrean nationality." But the report specifies that ID cards were issued in 1999, and Tadesse was living abroad at that time. Moreover, the deportation order specifically notes her Eritrean heritage, and since the IJ's decision to discount that document is not supported by substantial evidence, it would seem to provide adequate proof of her ethnicity. The IJ also pointed out that Tadesse stated in her asylum application that authorities mailed her the deportation order, whereas she testified that it was handed to her upon her release. The IJ believed this to be a major inconsistency going to the heart of Tadesse's claim, yet she never asked Tadesse about it at the hearing. She should have explored whether there was a good reason for the inconsistency, rather than bringing it up for the first time in the opinion, when it was too late to explain. *See Shtaro v. Gonzales*, 435 F.3d 711, 716 (7th Cir. 2006).

### D. Corroboration was inappropriately rejected

The BIA also erred by approving the IJ's treatment of Tadesse's torture counselor, Saule Buzaite. The IJ accepted an affidavit and then sent Buzaite—who was ready to testify—home, saying she could be recalled if "something comes up." But then the IJ proceeded to discount the affidavit's force in a number of ways. For instance, the IJ pointedly noted that "although Ms. Buzaite is a 'therapist' she is not a psychologist or psychiatrist." Buzaite's affidavit, prepared in January 2004, noted that she held a master's degree in psychology and expected to receive her Ph.D. in clinical psychology in August 2004—nine months before the IJ rendered her written decision. The IJ's comment was therefore incorrect as well as inappropri-

ate. Moreover, the IJ stated that even accepting Buzaite's conclusion that Tadesse suffered from Post-Traumatic Stress Disorder, "these symptoms of PTSD do not establishes [sic] that the events described in her testimony and her affidavit are the events which caused these symptoms." This assertion is completely at odds with Buzaite's affidavit, which repeatedly states that Tadesse's symptoms are characteristic of survivors of rape and torture. The IJ could not have carefully reviewed Buzaite's findings and reached this conclusion. This portion of the opinion, like so much else, is not supported by cogent reasons and cannot stand.

## E.  Future persecution claim must be reexamined

The IJ noted in a brief section toward the end of the opinion that even assuming Tadesse was credible and that she suffered past persecution, a fundamental change in country conditions—the regularization of relations between Ethiopians and ethnic Eritreans—means that any fear of future persecution would not be well founded. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A). But the BIA did not adopt this finding, and anyway, conditions have changed again since the IJ's decision: Ethiopia and Eritrea are on the brink of a proxy war in Somalia, which could well affect ethnic Eritreans in Ethiopia. *See* "It Just Gets Worse," The Economist, Apr. 28, 2007, at 54; Jeffrey Gettleman, "Chaos in Somalia as Fighting Intensifies and Death Toll Rises," N.Y. Times, Apr. 23, 2007, at A3. Moreover, the BIA should consider on remand whether Tadesse is entitled to relief under 8 C.F.R. § 1208.13(b)(1)(iii)(A). That regulation provides for so-called "humanitarian asylum" in the absence of a fear of future persecution where the past persecution was so heinous that repatriation would be inhumane. Tadesse suffered a gang rape that caused lasting psychological

damage and essentially lost her entire family in the war. She could well qualify. *See Brucaj v. Ashcroft*, 381 F.3d 602, 608-11 (7th Cir. 2004); *Lopez-Galarza v. INS*, 99 F.3d 954, 961-63 (9th Cir. 1996).

### III.  CONCLUSION

We do not lightly reverse the BIA's decision, given the deferential standard of review applicable in a petition for review. But the IJ's opinion, which the BIA echoed, is riddled with systematic and obvious errors. Tadesse did not receive a fair hearing, and she is entitled to a new one. We urge the Board on remand to reassign the case to a different immigration judge. *See Huang v. Gonzales*, 403 F.3d 945, 951 (7th Cir. 2005); *Yi-Tu Lian v. Ashcroft*, 379 F.3d 457, 462 (7th Cir. 2004); *Kerciku*, 314 F.3d at 919 (per curiam); *Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003); *cf.* Cir. R. 36. We GRANT the petition for review, VACATE the BIA's decision, and REMAND for further proceedings consistent with this opinion.

A true Copy:

      Teste:

 

                     _____
                     *Clerk of the United States Court of Appeals for the Seventh Circuit*