NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 11, 2012
Decided December 20, 2012

**Before**

WILLIAM J. BAUER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 12-2200

| | |
|---|---|
| SEYDOU N. SALL,<br>        *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | No. A097-122-350 |
| ERIC H. HOLDER, JR.,<br>Attorney General of the United States,<br>        *Respondent*. | |

## O R D E R

Seydou N. Sall, a 36 year-old native of Mauritania living in the United States without authorization, was forced out of his home country as a teenager after Mauritanian government officials transported him and his parents to a military detention camp at the Mauritania–Senegal border, and then expelled him from the country. He fears persecution by the Mauritanian government based on his race (black) and membership in a particular social group (the Toucouleur tribe). The Board of Immigration Appeals denied Sall's application after upholding the immigration judge's adverse credibility finding based on discrepancies concerning the reason Sall feared persecution. Substantial evidence supports this adverse credibility finding, so we deny the petition for review.

Sall applied for asylum in 2003, and later updated his application in 2006 after being placed in removal proceedings.  The IJ rejected Sall's application in 2007 based on lack of corroboration, but failed to make an explicit credibility finding.  The BIA vacated that decision and remanded for a credibility determination, with instructions to allow Sall to submit additional evidence and testify again, if necessary. Sall did both.  This petition for review concerns the second round of decisions by the IJ and BIA.

Sall's persecution claim involves racially motivated deportations that occurred between Mauritania and Senegal starting in 1989.  Sall was born in a village in southwest Mauritania, and he lived there with his parents until 1992.  He is part of the Toucouleur tribe (also called "black Fulani" in the United States).  The Toucouleur have traditionally lived near the Senegal River, which forms the boundary between Mauritania and Senegal. Minority Rights Group Int'l, *World Directory of Minorities and Indigenous Peoples - Mauritania: Black Africans*, http://www.unhcr.org/refworld/docid/49749ce7a.html (Dec. 11, 2012).  They are predominantly Muslim and have a caste-based social hierarchy. *Id.*  The Toucouleur held government positions during French rule, but after Mauritania gained independence in 1960, the Arab-speaking whites who controlled the government began discriminating against the Toucouleur and other black tribal Africans. *Id.*  This discrimination sparked the formation of the paramilitary group "African Liberation Forces of Mauritania" (FLAM), a failed military coup by Toucouleur military officers in 1987, and subsequent riots. *Id.* FLAM—which derives its initials from the group's French name, "Force pour la Liberation Africaine de Mauritanie"—advocated the overthrow of the government as a way to secure the rights of black tribal members. *Id.*

From 1989 to 1992, land disputes between Mauritania and Senegal escalated into large-scale deportations on both sides of the river. AFRICA SOUTH OF THE SAHARA 682, 882 (Katharine Murison, et al, eds., Europa Publications 32nd ed. 2002).  During this period, the Mauritanian government deported tens of thousands of black tribal members, falsely stating that they were Senegalese nationals. Kenneth B. Noble, *An African Exodus With Racial Overtones*, N.Y. Times, July 22, 1989, at A1.  As Sall explained, the government believed that his tribe sympathized with the Senegalese during these border disputes because they share the same ethnicity.  He wrote that his family was targeted "because we are black Fulani" and because the government "declared war" on the Fulani people. During his hearings, he testified that his family was also threatened because of his father's efforts to help people cross the border into Senegal.  He wrote in his application that his father supported FLAM.  When asked about FLAM, however, Sall replied "Who is FLAM?" and testified that his father was not involved in politics, but did support the "Fulani ethnic group."  Sall was unsure whether FLAM was the same as the Fulani ethnic group.

Sall testified that in 1992—when he was 15—military soldiers arrived at his home, beat him and his parents, and deported them to a military detention camp at Bogue, near the

Mauritania–Senegal border. In his first application he wrote that his family was beaten at their home and also on the truck to Bogue, but he streamlined the narrative in his second application and mentioned only the beating at the house. When asked to clarify, he testified that the beating began at the house and continued on the truck. Sall believes that his parents died at that camp, and he was deported across the border into Senegal in 1992.

Sall has not since returned to Mauritania, although many of his compatriots have. Sall married a fellow Mauritanian and lived in Senegal for a decade before coming to the United States in 2002. Because he has not returned to Mauritania, Sall's corroborative evidence consisted of background articles about the country and an affidavit from a former coworker who met Sall's wife in Senegal in 2009. Although the coworker swore in his affidavit that Sall's wife confirmed the details of what had happened to Sall in Mauritania, he testified at the hearing that he did not discuss Sall's past with her, speaking instead only about Sall's work in Illinois. The State Department reports that most of 70,000 displaced Mauritanians have returned home. U.S. DEP'T OF STATE, 2002 HUMAN RIGHTS REPORT: MAURITANIA 6 (March 2003).

The IJ rejected Sall's application based on an adverse credibility finding arising from discrepancies between Sall's written statements and his testimony. The IJ also relied on Sall's failure to provide corroborative testimony, noting that the only other witness, Sall's coworker, contradicted his sworn statement. The BIA upheld the IJ's adverse credibility finding, but it relied on only two discrepancies: the precise location of the 1992 beating (whether it occurred at the home, on the truck, or both) and the inconsistent reasons why Sall believed that Mauritanian government officials persecuted him and his parents—since he listed involvement with a political group as a reason he feared persecution, but at his hearing disclaimed knowledge of that group.

Because the BIA issued its own opinion rejecting portions of the IJ's analysis, this court reviews the BIA's decision. *Tadesse v. Gonzales*, 492 F.3d 905, 908 (7th Cir. 2007); *Zheng v. Gonzales*, 409 F.3d 804, 809 (7th Cir. 2005). Sall filed his application in 2003, so the pre-Real ID Act standards apply: Credibility determinations must be based on specific, cogent reasons that "go to the heart of the applicant's claim." *Giday v. Gonzales*, 434 F.3d 543, 550 (7th Cir. 2006); *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). This court will uphold the BIA decision so long as it is supported by substantial evidence, and will overturn it only if the record compels a contrary result. *Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008); *Torres v. Mukasey*, 551 F.3d 616, 626 (7th Cir. 2008).

Sall correctly argues that his statements about the beating at his home and on the truck to Bogue in 1992 cannot form the basis for an adverse credibility finding because they involve minor details and easily explained discrepancies. *See Tandia v. Gonzales*, 487 F.3d 1048, 1052–53 (7th Cir. 2007); *Uwase v. Ashcroft*, 349 F.3d 1039, 1042–45 (7th Cir. 2003). When asked about the perceived discrepancy, Sall explained that he and his parents were beaten both at his

home and on the truck to Bogue—an explanation consistent with all of his statements about the event.  Sall's failure to include both details in every statement about the 1992 beating is a minor omission given that his core claim of being expelled from Mauritania remained consistent.  *See Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007) (ruling that location of political meeting was immaterial because it did not concern basic claim of being detained and beaten for political activity); *Tandia*, 487 F.3d at 1053 (ruling that discrepancy concerning dates when applicant started school was trivial detail because core claim involved being forced to change schools).

Although the timing of the 1992 beatings is a trivial issue, Sall's inconsistencies in trying to explain the reasons for the beating provide substantial evidence for upholding the adverse credibility finding. *See Capric*, 355 F.3d at 1090–91; *Krouchevski v. Ashcroft*, 344 F.3d 670, 673–74 (7th Cir. 2003).  Sall's written applications alleged that he and his family were targeted because they supported FLAM, but at his hearing he disclaimed familiarity with the organization's name. When the immigration judge told him that he had listed it on his application, he still showed no recognition. His unfamiliarity with the group does not seem to stem from translation issues; Sall had the benefit of an interpreter and the transcript shows that he was otherwise able to answer questions clearly and coherently. *See Aung v. Gonzales*, 495 F.3d 742, 746 (7th Cir. 2007) (explaining that discrepancies did not arise from applicant's limited English skills because he had interpreter and asked for clarifications).

Adverse credibility findings can rely on a single inconsistency, provided that inconsistency is significant, as it is here.  *See Huang v. Gonzales*, 453 F.3d 942, 945, 947 (7th Cir. 2006).  Sall failed to explain the discrepancy and the BIA reasonably discounted his one attempt at corroboration—the coworker's affidavit—because the coworker's testimony contradicted his sworn statement. *See Korniejew v. Ashcroft*, 371 F.3d 377, 386 (7th Cir. 2004); *Capric*, 355 F.3d at 1086.  Sall's lack of corroboration provided a legitimate reason for the BIA to uphold the adverse credibility finding: a petitioner's failure to provide foundational evidence that is reasonably available casts a cloud on the petitioner's testimony, for purposes of pre-REAL ID Act standards. *See Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006); *Balogun v. Ashcroft*, 374 F.3d 492, 502 (7th Cir. 2004).

PETITION DENIED.