RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0062p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

AMADOU SY,

                                *Petitioner*,

    *v.*

PAMELA BONDI, Attorney General,

                                *Respondent*.

No. 25-3631

───────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 221 158 035.

Decided and Filed: March 3, 2026

Before: BATCHELDER, THAPAR, and MATHIS, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** Nicole Abruzzo Hemrick, HEMRICK O'MALLEY PLLC, New York, New York, for Petitioner. Lindsay Corliss, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

───────────────

**OPINION**

───────────────

THAPAR, Circuit Judge. Amadou Sy illegally entered the United States. After authorities detained him, Sy sought asylum, withholding of removal, and CAT protection. He argued that he would face persecution if he returned to his home country. But an immigration judge and the Board of Immigration Appeals rejected Sy's claims because his testimony wasn't credible. Since substantial evidence supports that conclusion, we deny Sy's petition for review.

I.

Amadou Sy, a Mauritanian national, entered the United States illegally. So a few months later, immigration officials detained him and began removal proceedings. Sy admitted that he was removable but applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). He said he was afraid that the government of Mauritania would kill or torture him based on his ethnicity and his past participation in protests against the government.

To substantiate that fear, Sy filled out an application form asking him to recount instances when "[he] or [his] family" had been persecuted. AR 643. In his responses and declaration, Sy stated Mauritanian police had repeatedly arrested him, jailed him for five days, and tortured him because he was black and a member of the Fulani ethnic group. Sy indicated that he had been jailed, beaten, and released a total of four times. Sy's declaration also stated that the police had arrested two of his friends and beaten them to death. But neither the affidavit nor Sy's application responses suggested that his family members had been persecuted.

Later, Sy testified before an immigration judge about this alleged persecution. Yet his stories about each arrest were strikingly similar. For example, Sy detailed that in 2011 he was arrested after protesting for rights for the Fulani people. The police held him for five days, stripped him naked, beat him, and threw him out of the police station after they thought he was dead. Then, a passerby found Sy and took him to the hospital. He testified that the exact same series of events happened in 2021: Sy was supposedly taken to the police station after protesting for rights for the Fulani people, stripped, beaten, held for five days, thrown out of the police station after police thought he was dead, and then taken to the hospital by a passerby. And Sy says the same exact thing happened in 2022. That's also what Sy testified happened in 2023 except for one alteration: After being held at the police station for five days—just like the last three times—Sy claimed that he and his fellow prisoners broke the lock and escaped on their own.

Sy's other testimony to the immigration judge contradicted his written application. Sy's application did not include any information about other family members who had been persecuted in Mauritania. Yet he testified to the immigration judge that his two brothers had also protested and been arrested, beaten, and released alongside Sy in 2011, 2021, and 2022. And he recalled that, in 2023, one of his brothers was with him when he was arrested. The other brother had, according to Sy, left Mauritania and begun living in New York. Neither brother testified during Sy's immigration hearing or provided a written declaration in support of Sy's account of events. Because Sy's testimony didn't match his earlier application, the immigration judge repeatedly asked him why he hadn't mentioned his brothers before. At first, Sy claimed that he "did talk about them" in his earlier application. AR 348. But Sy's attorney agreed with the immigration judge that Sy had not mentioned his brothers in his application. So Sy then argued that his "lawyer probably didn't write it," even though Sy "did mention it." AR 351.

Sy further testified that, following these arrests, the Mauritanian police were looking for him and wanted to kill him. So he decided to leave Mauritania. First, he took his wife and children to Senegal, which borders Mauritania. He told his wife to stay there, and then Sy left her and his children and returned to Mauritania. Next, Sy obtained a passport. In his declaration, Sy claimed he couldn't get a passport from the Mauritanian government because he was "black" and "did the protests," so he instead bought one from a "business person." AR 442. But in his later testimony to the immigration judge, Sy recounted that he went to the "white Mauritania[n] police" and gave them money in return for a passport. AR 353.

Either way, Sy eventually left Mauritania for good. He traveled through many countries, including Morocco, Spain, El Salvador, and Mexico. But Sy didn't seek asylum in any of these countries. When asked why he didn't go back to his wife and children, Sy stated simply that "I did not think to go with them in Senegal. I just [decided] to come here" to the United States. *Id.*

After hearing from Sy and an expert witness, the immigration judge denied Sy's applications and found him removable. That's because the judge determined Sy wasn't credible. To make that determination, the judge first stressed the inconsistencies in Sy's testimony about whether his brothers were present during his arrests in Mauritania. Likewise, there was "no reasonable explanation" for why Sy's brother who lived in New York failed to testify on Sy's

behalf—even by affidavit or video—or for how Sy obtained a passport from an allegedly hostile government.  AR 92–94.  The judge doubted that the Mauritanian government would "stamp[] his passport" and let him leave the country when Sy was allegedly a wanted man.  AR 93.  Finally, the immigration judge observed that the similarities between Sy's stories about each of his arrests "just seem[ed] incredible."  AR 97.  And the immigration judge found Sy's lack of medical records suspicious because he claimed to have gone to the hospital after the first three beatings left him near death.  In short, Sy had "failed to corroborate his case in frankly any way."  AR 92.

What's more, the immigration judge found that Sy's status as a black man of Fulani descent, on its own, didn't mean that Sy would be in danger if he returned to Mauritania.  The judge concluded that Fulanis don't face a pattern of persecution in Mauritania after being deported from the United States.  That meant Sy couldn't establish that he feared persecution or torture upon return to his home country as required for asylum, withholding of removal, or CAT protection.  *See* 8 U.S.C. §§ 1158(b)(1), 1231(b)(3)(A); 8 C.F.R. §§ 208.16(c), 208.17(a).  So the immigration judge denied Sy's applications.

Sy timely appealed to the Board of Immigration Appeals.  But the Board dismissed his appeal.  It found that "specific, cogent reasons" supported the immigration judge's decision and that the judge didn't clearly err in finding that Sy wasn't credible.  AR 9–11.  It also agreed that there was no pattern or practice of persecuting Fulanis in Mauritania.  That's because Sy's evidence showed only "widespread discrimination rather than persecution," which isn't enough to justify asylum.  AR 10.

Sy timely petitioned for review of the agency's decision.  He argues that the Board erred by (1) upholding the immigration judge's determination that Sy wasn't credible, and (2) finding that there was no pattern or practice of persecuting black Fulanis in Mauritania.

II.

Because the Board provided a written opinion, we review that order as the agency's final decision.  *Kilic v. Barr*, 965 F.3d 469, 472 (6th Cir. 2020).  To the extent that the Board adopted the immigration judge's reasoning, we also review the immigration judge's decision.  *Id.*  We

review legal questions de novo and factual findings—including credibility determinations—for substantial evidence. *Id.* at 473. That means the Board's determinations must "stand unless any reasonable adjudicator would be compelled to disagree." *Id.* (quoting *Nasrallah v. Barr*, 590 U.S. 573, 584 (2020) (cleaned up)). Substantial evidence supports the Board's findings here, so it didn't err by denying Sy relief.

### A.

Sy first argues that the Board erred by finding that he wasn't credible. To determine whether a petitioner is credible, the agency must consider the totality of the circumstances. *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011). Relevant factors include whether the applicant's story is inherently believable, whether his written and oral statements are consistent, and whether there are any inaccuracies or falsehoods in his narrative. 8 U.S.C. § 1158(b)(1)(B)(iii). And when the agency finds that the petitioner isn't credible, that finding is "fatal" to his claims for asylum, withholding of removal, and CAT protection. *Slyusar v. Holder*, 740 F.3d 1068, 1073–74 (6th Cir. 2014). In other words, the agency doesn't have to consider the merits of a non-credible petitioner's claims.

Substantial evidence supports the Board's finding that Sy wasn't credible. First, Sy's written declaration about his alleged persecution in Mauritania is inconsistent with his oral testimony. Sy's written application didn't state that his brothers were arrested with him—even in response to the specific question about whether Sy "or [his] *family members*" had been subject to persecution. AR 643 (emphasis added); *cf. Kolov v. Garland*, 78 F.4th 911, 922 (6th Cir. 2023) (finding that a material omission suggests a lack of credibility), *abrogated on other grounds by*, *Riley v. Bondi*, 606 U.S. 259 (2025). By contrast, Sy testified at length about his brothers' involvement in each of his supposed arrests in 2011, 2021, 2022, and 2023. This inconsistency undermines Sy's testimony that his family's experiences make him fear returning to Mauritania.

Sy fails to explain this conflict. Instead, he first denied that he left out what happened to his brothers from his written application. Sy then suggested that his "lawyer probably didn't write it" in his application, even though he had mentioned his brothers. AR 348, 351. Yet Sy

swore under oath that his earlier written application was "truthful, accurate, and complete." AR 177. Both statements can't be true at once—even if we believe that Sy told his lawyer about his brothers' involvement, that means his sworn statement that his application was "complete" wasn't true. The application omitted key information that other family members had also been persecuted. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). This inconsistency alone provides substantial evidence to support the determination that Sy wasn't credible.

Second, Sy's story of his arrests in Mauritania is inherently implausible, as both the immigration judge and the Board recognized. Sy insists that—on three separate occasions—he was arrested, held for precisely five days, beaten, released, and taken to the hospital in exactly the same way. And the same thing allegedly happened in 2023, except he escaped on his own by breaking the lock of his cell. First, the jailbreak story contradicted Sy's earlier affidavit, which claimed that the police "let [him] go" after all four arrests. AR 441. But more importantly, the striking similarities between the four arrests cast serious doubt on Sy's recollections. After all, common sense dictates that there would be at least *some* variation in how he was arrested each time over a span of 12 years. And it surely is not unreasonable, let alone clearly erroneous, for the immigration judge to doubt that each event occurred in exactly the same way.

Third, Sy's explanation of how he left Mauritania also makes little sense. Sy claims that he went to the Mauritanian police to buy a passport—the same police that he claims were searching for him and trying to kill him. (At one point, Sy claimed he got the passport from a "business person," but he later abandoned this story.) AR 442. Sy then notes that the Mauritanian government stamped his passport when he left the country—again, despite his status as a wanted man. So even after escaping police custody, Sy recounts that he willingly gave the Mauritanian authorities multiple opportunities to arrest him or kill him. And despite these opportunities, Sy managed to leave unhindered and unharmed. As the immigration judge found, that story simply doesn't add up. So the Board reasonably concluded that Sy wasn't credible.

In response, Sy points to an out-of-circuit decision which, according to him, shows that obtaining a passport doesn't undermine an asylum seeker's credibility. *See Tandia v. Gonzales*, 487 F.3d 1048 (7th Cir. 2007). In *Tandia*, the Seventh Circuit found it was "speculati[ve]" that the Mauritanian government had approved the asylum seeker's travel plans because he obtained

his passport through bribery.  *Id.* at 1054.  So the asylum seeker's ability to secure a passport didn't necessarily undermine his credibility.  *Id.*  But this case is very different.  According to Sy, he obtained his passport from the very police who were allegedly attempting to kill him.  And the Seventh Circuit didn't address a blatant inconsistency like that.

Sy's testimony has other holes.  For instance, he provided no reason why his brother—who now lives in New York—failed to testify or even provide an affidavit in support of his petition.  Yet Sy claims this brother was with him during his arrests in 2011, 2021, and 2022, so his brother could corroborate his allegations.  *See* 8 U.S.C. § 1158(b)(1)(B)(ii) (requiring an asylum applicant to corroborate his story when his testimony alone isn't sufficient).  When asked why his brother didn't testify, Sy simply said, "I don't know."  AR 352.  Sy also didn't provide any medical records from his repeated hospital visits following his alleged beatings.

And Sy doesn't explain why, after leaving Mauritania, he failed to seek asylum in any of the countries he passed through on his way to the United States.  If he were really looking for safety from the Mauritanian government, he could have asked any of those countries for asylum rather than wait to petition the United States for asylum when he was on the verge of removal.

Sy ultimately tries to explain away these shortcomings by saying that he is "uneducated." Petitioner's Br. at 9.  For example, Sy points to his inability to spell his own children's names or give their ages.  But Sy doesn't explain how his lack of education affects his credibility.  After all, even an "uneducated" person should be able to remember whether his brothers were with him when he was repeatedly arrested by police or how he obtained a passport to leave Mauritania.

In short, substantial evidence supports the agency's finding that Sy wasn't credible.  And that finding is "fatal" to Sy's petitions for asylum, withholding of removal, and CAT protection. *See Slyusar*, 740 F.3d at 1072.

## B.

Sy next argues that the Board erred by finding that he didn't establish a pattern or practice of persecution against black Fulanis in Mauritania.  Establishing a pattern of persecution is no easy task.  After all, "persecution is an extreme concept that does not include every sort of

treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (cleaned up). Instead, persecution requires "punishment or the infliction of suffering or harm." *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998). So discrimination alone doesn't qualify. *Id.* at 389–90.

Substantial evidence supports the Board's finding there is no pattern or practice of persecution against black Fulanis in Mauritania. To start, Fulanis are the largest ethnic group of black Africans in Mauritania—they're not a small or isolated minority. And there has been no broad attempt to harm or imprison Fulanis in Mauritania. Sy also hasn't shown that Fulanis experienced recent enslavement or face future enslavement despite Mauritania's legal protections.

Nor does Sy's expert testimony establish a pattern of persecution against Fulanis in Mauritania. Sy presented a professor, Charlotte Walker-Said, as an "expert" in human rights, ethnicity, and slavery in Mauritania. She explained that black Mauritanians constitute "an uneducated and marginalized black underclass" who are "effectively resigned to various forms of . . . manual labor." AR 300. Even if true, her testimony doesn't establish that black Fulanis are persecuted. After all, lack of education isn't "punishment" or "harm." *Mikhailevitch*, 146 F.3d at 389. The same goes for Walker-Said's testimony that black Fulanis perform manual labor because of economic necessity. Once again, a lack of access to high-paying jobs doesn't establish persecution because it's not "punishment" or "suffering." *Id.* So even accepting Walker-Said's description about conditions in Mauritania, the Board correctly concluded that Fulanis are at most subject to discrimination—not persecution.

Finally, Sy's argument also fails to the extent that he contends that the Board erred by not considering his *own* experiences of persecution in determining whether a pattern or practice existed. Sy's pattern-or-practice claim turns on whether he is likely to experience persecution based on "what has happened to others who are similarly situated." *Ali*, 366 F.3d at 411. So Sy needed to provide persuasive evidence of other Fulanis who were persecuted, not just repackage his stories of his own arrests, which the Board had already rejected. He failed to do that. The Board thus didn't err by finding that there was no pattern or practice of persecution of black

Fulanis in Mauritania.  And it didn't err by denying Sy's petitions for asylum, withholding of removal, and CAT protection.

\* \* \*

The petition for review is denied.