In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1836

DONALD HANAJ,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A77-839-228

ARGUED NOVEMBER 28, 2005—DECIDED MAY 3, 2006

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Petitioner, Donald Hanaj, entered the United States without admission, parole or inspection through Canada, and applied for asylum in 1999. The asylum application was also considered as a request for withholding of removal and for protection under the United Nations Convention Against Torture. The immigration judge denied his application, and ordered him removed, and the BIA summarily affirmed. Hanaj now seeks relief from this court.

I

At the hearing, the immigration judge was presented with the testimony of Hanaj, as well as that of numerous witnesses. We turn first to Hanaj's testimony.

Hanaj testified that he is an ethnic Albanian who was born in Gjilan, Kosovo, on May 19, 1980, and resided there until April 1998 when he was forced to leave due to persecution by Serbian officials. His father was an active member in the League Democratic of Kosovarian ("LDK"), a political party opposed to Serbian rule over Kosovo, and Hanaj and his brother later became members as well. When Hanaj was ten or eleven years old, his father moved to Germany because the Serbian special police sought to kill him for his political activities. Hanaj's brother, Eduard, was later forced to leave as well, and he ultimately obtained asylum in England. The police searched Hanaj's home on several occasions for evidence relating to the departure of his father and brother, and threatened to burn down the home if they found anything incriminating. Hanaj formally joined the LDK in 1996 when he was sixteen, and received a membership card. At the hearing, Hanaj was questioned as to why his membership card contained the dates of 1992 to 1995. He testified that the LDK used old cards because they lacked the means to make new ones.

In 1996, several police officers approached Hanaj on the street, speaking to him in Serbian. When he responded to them in Albanian, they became angry and hit and kicked him for ten minutes, leaving scars on his lip and shin. Hanaj went to the Serbian-run hospital, but was refused treatment because he was Albanian. A few months later, a vehicle Hanaj was driving was stopped at a police roadblock and searched, and LDK leaflets were found under the car seat. Hanaj and his friends were then transported to the police station, where they were separated. Hanaj was then questioned about LDK and his father. He denied any

involvement with LDK, and foreswore knowledge of his father's whereabouts. Hanaj also refused to identify LDK members whose pictures he was shown. During this interrogation, he was first struck repeatedly on his head. The police then handcuffed him and chained the handcuff to a hook on the wall, leaving him hanging by the chain. He was then beaten with a whip and a wooden stick. When he began to fade in and out of consciousness, the police removed him from the wall and beat the soles of his feet with a wooden stick until they were bleeding and swollen. He was subsequently placed in a cell which contained water and salt on the floor to exacerbate those wounds. Three days later, Hanaj found himself at a hospital, but had no recollection as to how he got there or what transpired in the interim. It took a month of care at home before Hanaj recovered from those injuries.

Hanaj had yet another violent encounter with the police when he was about seventeen years old, after a search at a roadblock again yielded banned materials including LDK leaflets and a book about Kosovo. He was interrogated, hit with wooden sticks and a riding crop, and once again placed in a basement cell. This aggravated his prior injuries.

In November 1997, Hanaj and approximately 1,000 other ethnic Albanians gathered in a demonstration led by the leader of the local LDK, to celebrate Albanian flag day. When the Serbian police tried to break up the demonstration, the Albanians responded by throwing rocks, and the Serbian police then shot into the crowd. One of Hanaj's close friends, Naim Frasheri, was hit by a bullet. Hanaj and his friends took Naim to Hanaj's house, where Naim died shortly thereafter.

The final event precipitating Hanaj's departure occurred in April 1998, when his father unexpectedly returned home. Shortly after his arrival, Hanaj's mother responded to a knock at the door. Upon opening the door, she encountered

the Serbian police, who struck her on the head with the butt of a gun, and she fell to the ground unconscious. The police kicked Hanaj's father and then searched him, finding an Albanian flag and a book by a national LDK leader. When Hanaj's father spit on the police, they shot and killed him. At that time, Hanaj fled to his uncle's house, where his uncle gave him some money and sent him to a cousin in Macedonia. Because many Serbs lived in Macedonia, his cousin recommended that Hanaj continue on to Greece. After arriving in Greece, Hanaj contacted his uncle and learned that his parents had both died and that a warrant for Hanaj's arrest had been left at Hanaj's home.

Eventually, Hanaj traveled to Canada by ship. Once there, he climbed under a truck and hid in the space where a spare tire is normally kept. The truck crossed the border into the United States, and when it slowed to a near stop, Hanaj jumped out. He made his way by bus from that location in Plattsburg, New York, to Chicago.

In support of his asylum application, Hanaj introduced his birth certificate, the arrest warrant that his uncle mailed to him in Greece, his LDK membership card, and the international driver's license that he had with him when he fled Kosovo. He further presented the testimony and affidavits of many witnesses to corroborate his claim of torture and persecution. Among those was the affidavit of Dr. James Sanders, who documented scars on Hanaj's heel, head, shoulder, back, palms and leg consistent with his allegations of the beatings. Dr. Sanders is a board-certified family physician, who has worked at the Center for Victims of Torture in Minneapolis, Minnesota, and established the Advocates of Survivors of Trauma and Torture in Baltimore, Maryland. He received post-graduate education in the examination, diagnosis and treatment of torture survivors at Harvard and Columbia universities. He also served as a program officer for a large international relief operation in Kosovo in 1996-97. Hanaj further submitted an affidavit of

Alison Duncombe, a physical therapist who spent four sessions with Hanaj to treat him for back, leg, and neck pain and frequent headaches.

Hanaj also presented testimony from Julie A. Mertus, a human rights professor and a specialist on country conditions in Kosovo. Mertus testified that Hanaj's description as to the type of torture he experienced was consistent with the descriptions provided during that time period by numerous ethnic Albanians in Kosovo who Mertus had interviewed, especially his experience in being beaten on the bottom of the feet and placed in wet cells. Mertus testified as to her belief that the Serbian police were trained to act in a specific way and that there was a pattern and practice to the type of torture Hanaj experienced. Her testimony further detailed her extensive experience in Kosovo, including as the author of a book on Kosovo based on ten years of study and extensive field work. She was asked to participate on a task force convened by the White House on the future of Kosovo, and visited Kosovo on a NATO-sponsored trip.

In addition, Hanaj introduced the testimony of Dr. Steven Patt, a psychiatrist who had been treating Hanaj once or twice a month for approximately fifteen months as of the time of the hearing, for a total of approximately 20-25 sessions of 50 minutes each. Dr. Patt diagnosed Hanaj as definitely suffering from post-traumatic stress disorder ("PTSD"), and after 10 months of treatment had prescribed medication for Hanaj to ease the symptoms. Dr. Patt testified that he does not doubt the truth of what Hanaj described to him regarding his experiences in Kosovo. Dr. Patt added that in his profession, he listens to patients with the understanding that they are not always truthful, but that he found Hanaj to be very reliable. Throughout the many months of treatment, Hanaj was detailed in describing what happened and was consistent in that Dr. Patt did not hear anything from him that conflicted with anything

heard at a different time, including his descriptions of the beatings by the police, the fatal shooting of his friend, and the deaths of his parents. Moreover, Dr. Patt further stated that Hanaj's descriptions were plausible and that everything in his clinical picture fit with what Dr. Patt heard from Hanaj. In addition, Dr. Patt stated that Hanaj's descriptions were consistent with the persecution that other Kosovar patients had described to him in his practice. Dr. Patt's experience with other torture victims stemmed from his volunteer work at the Marjorie Kovler Center for the Treatment of Survivors of Torture ("Kovler"), which referred torture and abuse victims in need of psychiatric treatment to him. Through Kovler, Dr. Patt had treated four patients, including three torture victims who were ethnic Albanians from Kosovo. An affidavit from Mario Gonzalez, the clinical supervisor at Kovler, revealed that Gonzalez spent four sessions with Hanaj of three hours each, and that he concluded that Hanaj was suffering from PTSD and referred him to Dr. Patt for treatment.

Hanaj presented other corroborating testimony as well. Kelly Lynn Maynard, a linguist, testified as to an analysis of Hanaj's speech, concluding that it was consistent with the speech of persons in Southeastern Kosovo, specifically Gjilan. The government did not contest her qualifications as an expert or the admissibility of her testimony, but cross-examined as to her conclusions. Hanaj also presented an affidavit from his brother as to where they were born and lived and the activities on behalf of the LDK, and included a copy of his brother's passport, driver's license and visa listing his brother's birthplace as Kosovo.

The government presented two witnesses. Gideon Epstein, an expert document examiner from the federal government's Forensic Document Laboratory, examined the documents submitted by Hanaj. After comparing Hanaj's birth certificate to four authentic birth certificates in FDL's files, Epstein concluded that the birth certificate was a

fabricated document. Epstein also concluded that the international driver's license was a very poor quality counterfeit. The FDL files did not contain documents similar to the arrest warrant and the LDK membership card, so Epstein reached no conclusion as to the validity of those documents.

The second government witness was Claudia H. Field, the asylum officer who interviewed Hanaj for approximately 1-1½ hours with the assistance of an interpreter provided by Hanaj. Officer Field testified that she conducts more than one interview a day, and takes notes which she uses to write a report two to five days later. Officer Field concluded that Hanaj was not credible based on a number of inconsistencies between Hanaj's application and his responses to her questions during the interview. Among those inconsistencies were that: Hanaj stated that on April 11, 1997, the second time he was stopped at a roadblock, he showed the police his international driver's license, but the driver's license was issued four days later on April 15; Hanaj stated that he refused to go to the hospital on April 11 after the detention and beating but the asylum application indicates that he went to the hospital and was denied treatment; Hanaj was inconsistent in the dates that his father had left home; Hanaj claimed to join the LDK in 1996 but the membership card was dated 1992 to 1995; and Hanaj was inconsistent in explaining how he crossed the border from Canada to the United States. In response to questioning, Officer Field acknowledged that Hanaj was consistent in his description of the times he was stopped, beaten and tortured by the Serbian police, and the day his parents were killed. She further acknowledged that the types of beatings described by Hanaj are consistent with her knowledge of how Serbian police treated ethnic Albanians according to the Country Condition Reports from Kosovo. She did not ask Hanaj whether he had scars from the beatings, and therefore the physical corroboration of his description of events was not a part of her credibility determination.

II

In order to succeed on a claim for asylum, an applicant must demonstrate that he is unable or unwilling to return to his country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); *see Hernandez-Baena v. Gonzales*, 417 F.3d 720, 722-23 (7th Cir. 2005). An applicant who demonstrates past persecution is entitled to a rebuttable presumption of a well-founded fear of future persecution. *Id.*

The immigration judge began by reciting the above testimony and evidence in his decision. He held that the incidents described by Hanaj in his application and testimony clearly indicated a level of mistreatment that rises to the level of persecution, and therefore that the critical issue was whether his claim was credible. In assessing credibility, however, the IJ based his decision almost entirely on the determination by Epstein that the birth certificate was not genuine. The IJ relied on *In re O-D-*, 21 I. & N. Dec. 1079, (BIA 1998), quoting it as holding that "'presentation by an asylum applicant of an identification document that is found to be counterfeit by forensic experts not only discredits the applicant's claim as to the critical elements of identity and nationality, but, in the absence of an explanation or rebuttal, also indicates an overall lack of credibility regarding the entire claim.'" IJ Op. at 9. The IJ noted that Hanaj's birth certificate was determined to be a "known counterfeit," and that Hanaj had submitted "other documents of questionable authenticity, including the LDK membership booklet." *Id.* at 10. The court also noted without further explanation that "there are additional credibility concerns based upon inconsistencies and implausibilities contained in the record and cited above"—which presumably related to the inconsistencies noted by the asylum officer. *Id.* Based on *In re O-D-*, the IJ

determined that Hanaj had not presented a credible claim. Because the BIA affirmed without opinion, we review the IJ's decision to determine whether it is supported by substantial evidence, and must affirm if the decision is supported by reasonable, substantial and probative evidence on the record considered as a whole. *Tolosa v. Ashcroft*, 384 F.3d 906, 908 (7th Cir. 2004).

In *Kourski v. Ashcroft*, 355 F.3d 1038, 1040 (7th Cir. 2004), we explicitly rejected the application of *In re O-D-* used by the IJ in this case, holding that absent reason to believe that the applicant knew or suspected the forgery, proof that a document was a forgery would not be evidence that the applicant was lying. The applicant in *Kourski* asserted that he was born in Russia and was persecuted because he was Jewish. The only evidence that he presented as to his Jewish identity other than his sworn testimony was a copy of a purported Russian birth certificate listing his nationality as Jewish. *Id.* at 1038. We noted that the testimony of an applicant, if believed, can be sufficient in itself to sustain a burden of proof without corroboration, and therefore that discrediting of the corroboratory evidence did not necessarily doom the claim. *Id.* at 1039. In *Kourski* the IJ did not fault Kourski for lack of corroboration, but instead concluded that the forgery demonstrated that he was not a credible witness. It was that leap of logic that we criticized in *Kourski*, and that the IJ similarly made in the present case. As we held in *Kourski*, the forged nature of a document undermines an applicant's credibility only if the IJ concludes that the applicant knew or suspected the document had been forged. *Id.* at 1039-40. In fact, even in that circumstance, an innocent explanation is possible, for an applicant lacking evidence of his true identity might be tempted to procure fraudulent documentary evidence to avoid returning to a place of persecution, but an IJ would not be required to draw that conclusion. *Id.* at 1040. However, absent a determination that the applicant had

reason to know that the document was forged, "its existence does not undermine his credibility, though it deprives his testimony of the extra boost to credibility that it would have if it were corroborated." *Id.*

The IJ in this case made no finding that Hanaj knew or had reason to know that the birth certificate was forged. That is not surprising given that Hanaj's uncontroverted testimony was that the birth certificate was obtained by his mother who told him she had obtained it from a government agency when he was about thirteen or fourteen years old, and it was sent to him by his uncle after he fled to Greece. Those circumstances are indistinguishable from that in *Kourski*. *Id.* at 1038.

In fact, the IJ's use of the inauthentic birth certificate to discredit Hanaj's claim in its entirety is more egregious, because the IJ relied on the fraudulent nature of the document to discredit not just Hanaj's testimony, but the corroborating testimony of all of his witnesses as well. In *Kourski*, the applicant presented only his own testimony and the birth certificate to establish his identity. Hanaj, however, presented substantial evidence corroborating his claim to be an Albanian persecuted in Kosovo who was persecuted because of his status, all of which was ignored by the IJ in making the credibility determination. That included testimony that the type of torture he described was reflective of the experience of other ethnic Albanians in Kosovo during the same time period, including details such as the use of wooden sticks to beat the bottoms of feet and then the placement in a cell with salt water on the ground. Hanaj's recitation of the details of that torture was consistent over a fifteen-month period, and approximately 20 hours, of therapy. Moreover, his allegations were considered credible by his treating psychiatrist and by the clinical supervisor at Kovler. His identity was confirmed by his brother, who had himself sought and obtained asylum in England. Significantly, Hanaj even possessed physical

corroboration of his testimony, in the form of scars on his heel, head, shoulder, back, palms and leg consistent with his allegations of torture.

Inexplicably, the IJ did not mention any of this testimony and evidence in his credibility determination. In fact, the IJ's only reference to the rest of the significant evidence of record was his off-hand reference to inconsistencies in the record, which appears to refer to the asylum officer's recitation of inconsistencies between his application and oral statements. That reliance is misplaced. The alleged inconsistencies referenced by the asylum officer relate to insignificant matters, not the type of statements material to his claim. Moreover, Officer Field acknowledged that Hanaj was consistent in his description of the detentions, beatings, torture and his parents' deaths—all of the acts forming the basis of his persecution claim. In relying on purported inconsistencies, the IJ relied on the hour-long interview with Officer Field, but inexplicably failed to mention Dr. Patt's testimony that Hanaj was consistent and detailed in his descriptions of the events over the 50-minute weekly and bi-weekly sessions with Dr. Patt, spanning a 15-month period. We have repeatedly held that trivial inconsistencies are not a basis for discrediting testimony. *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2005); *Balogun v. Ashcroft*, 374 F.3d 492, 504 (7th Cir. 2004) ("[i]nconsistencies that do not relate to the basis of the applicant's alleged fear of persecution are less probative than inconsistencies that do.") Inconsistencies such as whether he showed the international driver's license or his Kosovo driver's license at the police roadblock are precisely that type of trivial inconsistency, and that is true of the inconsistencies targeted by Officer Field as a whole. An IJ must analyze inconsistencies against the backdrop of the whole record, as one factor in the overall credibility determination. *Balogun*, 374 F.3d at 504. No such examination occurred here, as the IJ did not even mention the

testimony of Hanaj's witnesses in reaching his credibility decision. The IJ cannot selectively examine evidence in determining credibility, but must present a reasoned analysis of the evidence as a whole. Instead, the IJ in this case used the allegedly forged nature of the documents to negate the credibility of the claim as a whole, and to negate the relevance of all other corroborating evidence presented. That goes beyond even the improper use in *Kourski*, and must be rejected for the same reason. The denial of asylum lacks a reasoned basis, and therefore the order of removal is vacated and the case returned to the immigration authorities for further proceedings consistent with this opinion. Although the choice of presiding judge is left to the discretion of the BIA, we urge that the BIA assign the matter to a different judge on remand. *See* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit; *see also Gjerazi v. Gonzales*, 435 F.3d 800, 813 (7th Cir. 2006), *Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003). Petitioner Hanaj may recover his costs in this court.

No. 05-1836                                                13

A true Copy:

    Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*