In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-1299

HENRY A. KADIA,

*Petitioner*,

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent*.

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A 95-583-344

———————

ARGUED DECEMBER 6, 2006—DECIDED SEPTEMBER 7, 2007

———————

Before POSNER and WOOD, *Circuit Judges*.[Œ]

POSNER, *Circuit Judge*.   The petitioner sought asylum
in the United States on the ground that if he is returned to
Cameroon, his native country, he is likely to be persecuted
because of his political opinions. The Board of Immigra-
tion Appeals affirmed the immigration judge's denial of

———————

[Œ] The third member of the panel, Judge Ripple, recused himself
after the oral argument, and has not participated in the con-
sideration or decision of the case.

asylum, agreeing that the judge was entitled to disbelieve the petitioner. The petitioner testified that when living in Cameroon he was politically active in parties that advocate (but do not attempt to achieve by violence or other unlawful means) secession of the southern part of the country, see, e.g., Piet Konings, "Opposition and Social-Democratic Change in Africa: The Social Democratic Front in Cameroon," 42 *Commonwealth & Comparative Politics* 289, 292 (2004); U.S. Dep't of State, *Country Reports on Human Rights Practices—2003* 16 (Feb. 25, 2004); "Cameroon: Secessionist Minority Anglophone Group Silenced," *IRIN Humanitarian News and Analysis* (Feb. 19, 2007), www.irinnews.org/report.aspx?ReportID= 70258 (visited Aug. 7, 2007), and that as a result of his activity he was arrested many times, repeatedly detained, and often beaten and otherwise tortured. Had the immigration judge believed his narrative, the petitioner would have been found to be a victim of persecution on the ground of his political beliefs and would therefore have been entitled to a presumption that his fear of persecution if he is returned to Cameroon is well founded. 8 C.F.R. § 208.13(b)(1); *Gomes v. Gonzales*, 473 F.3d 746, 753 (7th Cir. 2007).

Judicial review of a credibility determination is limited, especially when it is based on the witness's demeanor, which the reviewing court cannot review, or is made by a jury, which does not give reasons for its judgment. "Credibility assessments can embody a struggle between norms of subjective and objective decision-making. Subjective assessments are highly personal to the decision-maker, dependent on personal judgment, perceptions, and disposition, and often lacking in articulated logic. They are very difficult to review and are likely to be inconsistent from one decision-maker to another." Michael Kagan, "Is Truth

in the Eye of the Beholder: Objective Credibility Assessment in Refugee Status Determination," 17 *Geo. Immigration L.J.* 367, 374 (2003). Yet we noted in *Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005), that immigration judges' "insensitivity to the difficulty of basing a determination of credibility on the demeanor of a person from a culture remote from the American" is a "disturbing feature" of many immigration cases, and in *Djouma v. Gonzales*, 429 F.3d 685, 687-88 (7th Cir. 2005), that immigration judges often lack the "cultural competence" to base credibility determinations on an immigrant's demeanor.

In a case such as this, in which the basis for the evaluation of the witness's credibility is set forth in detail by the trier of fact and has nothing to do with demeanor but consists instead of inconsistencies or falsehoods in the witness's testimony that the trier of fact enumerates in his opinion, the reviewing court has more than suspicion to work with in deciding whether the determination of credibility was reasonable. *Gao v. Board of Immigration Appeals*, 482 F.3d 122, 127 (2d Cir. 2007) ("credibility determinations that are based on the IJ's analysis of testimony, as opposed to demeanor, are granted less deference"); *Chen v. U.S. Dep't of Justice*, 426 F.3d 104, 113 (2d Cir. 2005); *Arulampalam v. Ashcroft*, 353 F.3d 679, 685-86 (9th Cir. 2003); *Cordejo-Trejo v. INS*, 40 F.3d 482, 487 (1st Cir. 1994). As the Supreme Court has explained, "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [of the civil rules] demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate

his findings from review by denominating them credibil-
ity determinations, for factors other than demeanor and
inflection go into the decision whether or not to believe a
witness. Documents or objective evidence may contradict
the witness' story; or the story itself may be so internally
inconsistent or implausible on its face that a reasonable
factfinder would not credit it. Where such factors are
present, the court of appeals may well find clear error
even in a finding purportedly based on a credibility
determination." *Anderson v. City of Bessemer*, 470 U.S. 564,
575 (1985).

Review still is deferential in such a case, as we implied
in posing the question as whether the determination of
credibility was reasonable, not whether it was correct.
Indeed, the standard of review remains the same ("reason-
able" or, the more conventional but equivalent formula,
"supported by substantial evidence") even if the determi-
nation is based entirely on documents rather than live
testimony. E.g., *Onsongo v. Gonzales*, 457 F.3d 849, 854
(8th Cir. 2006); *Sterkaj v. Gonzales*, 439 F.3d 273, 278 (6th
Cir. 2006). It is merely that, as suggested by the Supreme
Court in *Anderson*, the reviewing court is in a better
position to decide whether the credibility determination
was reasonable if the determination was based entirely
on documentary evidence. See also *Hanaj v. Gonzales*, 446
F.3d 694, 698-99 (7th Cir. 2006); *Kourski v. Ashcroft*, 355
F.3d 1038, 1040 (7th Cir. 2004); *Yeimane-Berhe v. Ashcroft*,
393 F.3d 907, 911 (9th Cir. 2004).

In recent years an avalanche of asylum claims has placed
unbearable pressures on the grossly understaffed Immigra-
tion Court, and we and other courts have frequently
reversed the credibility determinations made by immigra-
tion judges and affirmed by the also sorely overworked

Board of Immigration Appeals. E.g., *Tarraf v. Gonzales*, No. 06-2835, 2007 WL 2164157, at *6 (7th Cir. Jul. 30, 2007); *Benslimane v. Gonzales*, 430 F.3d 828, 829-30 (7th Cir. 2005); *Solomon v. Gonzales*, 454 F.3d 1160, 1162 (10th Cir. 2006); *Fiadjoe v. Attorney General of United States*, 411 F.3d 135, 160 (3d Cir. 2005); *Secaida-Rosales v. INS*, 331 F.3d 297, 313 (2d Cir. 2003). An article by Edward R. Grant, "Laws of Intended Consequences: IIRIRA and Other Unsung Contributors to the Current States of Immigration Litigation," 55 *Cath. U. L. Rev.* 923, 959 (2006), reports that two-thirds of the judicial reversals of asylum decisions in the first two months of 2006 involved problems with credibility determinations. Grant criticizes these reversals, yet he himself—a member of the Board of Immigration Appeals—was discovered to have decided more than 50 immigration cases in one day, requiring a decision "nearly every 10 minutes if he worked a nine-hour day without a break." Lisa Getter & Jonathon Peterson, "Speedier Rate of Deportation Rulings Assailed," *Los Angeles Times* (Jan. 5, 2003), www.usdoj.gov/eoir/press/03/speedierrate.pdf2003 (visited Aug. 17, 2007). (If he worked eight hours and took a lunch break, he had no more than 7 minutes per case.)

Deference is earned; it is not a birthright. Repeated egregious failures of the Immigration Court and the Board to exercise care commensurate with the stakes in an asylum case can be understood, but not excused, as consequences of a crushing workload that the executive and legislative branches of the federal government have refused to alleviate.

In this case there were a number of inconsistencies between the petitioner's testimony at the immigration hearing and the written statement that he had submitted

earlier in support of his application for asylum, and in addition the documentary evidence that he submitted contained anomalies. A reasonable trier of fact could have concluded that the petitioner had lied about his political activities in Cameroon and their consequences. But the immigration judge made a number of mistakes, uncorrected by the Board, in his assessment of the evidence, and we cannot be confident that had he not made those mistakes he still would have disbelieved the petitioner. So although the doctrine of harmless error is applicable to judicial review of immigration decisions, e.g., *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004); *Nagarurih v. Ashcroft*, 371 F.3d 182, 191 n. 8 (4th Cir. 2004), as to other administrative review, e.g., *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003), it cannot save the day for the government in this case.

The immigration judge failed to distinguish between material lies, on the one hand, and innocent mistakes, trivial inconsistencies, and harmless exaggerations, on the other hand. In effect, he applied the discredited doctrine of *falsus in uno, falsus in omnibus* (false in one thing, false in all things), which Wigmore called "primitive psychology," John H. Wigmore, *A Students' Textbook of the Law of Evidence* 181 (1935), and—in a characterization that we endorsed in *United States v. Schimmel*, 943 F.2d 802, 808 (7th Cir. 1991)—an "absolutely false maxim of life." 3A Wigmore, *Evidence in Trials at Common Law*, § 1008, p. 982 (James H. Chadbourn ed., rev. ed. 1970); see also *Yongo v. INS*, 355 F.3d 27, 33 (1st Cir. 2004); *United States v. Weinstein*, 452 F.2d 704, 713 (2d Cir. 1971) (Friendly, J.); *Virginian Ry. v. Armentrout*, 166 F.3d 400, 405 (4th Cir. 1948). Anyone who has ever tried a case or presided as a judge at a trial knows that witnesses are prone to fudge, to

fumble, to misspeak, to misstate, to exaggerate. If any such pratfall warranted disbelieving a witness's entire testimony, few trials would get all the way to judgment.

It is true that the Real ID Act allows an immigration judge in asylum cases to consider, in determining credibility, falsehoods or inaccuracies "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Castaneda-Castillo v. Gonzales*, 488 F.3d 17, 23 n. 6 (1st Cir. 2007), treats this as a revival of the doctrine of *falso in uno*, *falso in omnibus*. We are dubious. The passage quoted from the Act must be placed in context:

> *Considering the totality of the circumstances, and all relevant factors,* a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), *and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim,* or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added). The immigration judge may consider inaccuracies or falsehoods that do not go to the heart of the asylum applicant's claim, but he can do so only as part of his consideration of "the totality of the circumstances, and all relevant factors." He cannot discredit otherwise persuasive testimony because of a misspelling in the asylum application. In any event, the provision is not applicable to this case, because the application preceded the effective date of the Real ID Act.

The immigration judge summarized his evaluation of credibility by saying that the petitioner's testimony "was either exaggerated for the purpose of enhancing his eligibility for asylum or completely untrue." The judge thought the difference immaterial, but it is vital. If the petitioner wasn't arrested six times, but only half as many, and if he was merely beaten rather than having burning rubber poured on his back as he stated in his written statement but (initially) not in his testimony, these fabrications would not *necessarily* demolish his claim to have a well-founded fear of persecution should he be returned to Cameroon, as the immigration judge seems to have assumed. If the judge thought the petitioner was not a political opponent of the government who had been persecuted for his political opinions and would be if he went back, he should have said so.

Some of the inconsistencies that he noted are trivial—the sort of innocent mistake that a person testifying about events that had occurred years earlier would be likely to make, such as the petitioner's testimony that he had been arrested on January 8, 2000 (more than four years before the hearing), for participating in a demonstration that he had not participated in, and his written statement that he had been arrested on January 28 of that year

for having participated in a demonstration three days earlier. Human memory is selective as well as fallible, and the mistakes that witnesses make in all innocence must be distinguished from slips that, whether or not they go to the core of the witness's testimony, show that the witness is a liar or his memory completely unreliable.

Some of the "inconsistencies" cited by the immigration judge in this case were not inconsistencies at all. He noted that Kadia had testified that he'd been released from his first detention only "after signing a statement indicating that he would not [*sic*] longer participate in demonstrations," but, the judge added, "by contrast" in his written statement Kadia "indicate[d] that he was 'released on condition.'" There is no inconsistency; Kadia's agreeing not to participate in future demonstrations *was* the condition of his being released.

The immigration judge attached particular weight to what he thought questionable features in the documents submitted to corroborate the petitioner's testimony. He noted for example that a letter from the Human Rights Defense Group on behalf of the petitioner was signed by a person who identified himself as "Coordinator" but that the accompanying affidavit identified him as "Deponent Coordinator," which the judge considered a suspicious variance in the person's title. It is far more likely that "deponent" was used merely to signify that the person was an affiant; "affiant" and "deponent" are common synonyms in affidavits. The affiant indicated on the first document only his title and on the second his title *and* the capacity in which he was signing it, that is, as an affiant.

The immigration judge speculated that the affidavit had been forged by the petitioner because it misspelled "diehard" (in the phrase "diehard supporter") as "die

heart" and the same misspelling had occurred in the petitioner's written statement in support of his application. This is the point at which our earlier remark that deference is earned rather than being a birthright bites with particular force. Deference is accorded to the factfindings of government agencies because they know more about the activities they regulate than the courts do. In the case of the Immigration Court, any edge in knowledge would derive from a familiarity, denied generalist judges, with foreign customs and practices. Yet the petitioner is a member of the English-speaking minority in Cameroon and the immigration judge seems not to have realized—what is obvious even to a generalist judge—that conventions regarding spelling and vocabulary differ among the world's English-speaking populations. The words "defense" and "labor" in American English are spelled "defence" and "labour" in English English, and for our (car) "hood" the English have "bonnet." So the American "diehard" may have a variant in Cameroon English. In fact, in Cameroon as in a number of other countries in which English is the or a principal language, including Jamaica and Pakistan, a common variant of "diehard" is—"die heart" or "die-heart." *The Eggcorn Database—v.0.5,* http://eggcorns.lascribe.net/english/401/die-hearted/ (visited Aug. 5, 2007); *Ubstudents.com,* www.ubstudents.com/index.php/hotvibes/showStory/21/more-on-ubsu-wahala.aspx (visited Aug. 5, 2007). Thus in a September 2004 issue of a Cameroon newspaper, *The Post Online (Cameroon),* www.postnewsline.com/2004/09/strongelections.html (visited Aug. 5, 2007), we read of "die-hearted followers" of one of the Anglophone parties that the petitioner belonged to.

We do not say that the petitioner has proved that he was persecuted, because there were inconsistencies and

anomalies in his evidence that we have not mentioned that might have justified an inference that his claim was fabricated. But the immigration judge's mistakes in assessing the evidence require a remand because we cannot know whether, had he not committed those mistakes, he would nevertheless have rejected the petitioner's claim. Ordinarily this would require merely a remand for the judge to review the transcript of the hearing and the documentary evidence. But the judge committed a further error in his mode of questioning the petitioner at the immigration hearing that precludes so limited a form of relief. He would ask him a series of questions that omitted a key issue, and then infer from the petitioner's failure to address that issue that he was contradicting his written statement. Remember the burning rubber? In asking the petitioner about the arrest and detention in which according to his statement he had been subjected to that form of torture, the judge asked "did they just punch your [*sic*] or kick you or what happened?" and the petitioner replied "They used to take you like this and put your foot on door," and the judge then said, "They hit your feet?" and the petitioner replied "Hit your feet, yes." The judge continued: "And then, they put you back in the regular warehouse," and the petitioner replied "In the warehouse, yes." At this point the judge changed the subject. He didn't ask the petitioner "and was anything else done to you besides hitting your feet"? A witness would be unlikely to interrupt the presiding judicial officer by answering a question not asked. A lawyer could have repaired the damage by asking the missing questions of his witness, but the petitioner had no lawyer.

Later, it is true, the judge recalled that the petitioner had mentioned the burning rubber in his written application for asylum, and the following exchange ensued:

Q. You didn't mention that [the melted rubber]. Was that some other incident or is that this incident?

A. Well, that's the incident, Your Honor.

Q. But you didn't tell me that when you said that. I asked you what harm you suffered. You didn't tell me anything.

A. Okay.

The judge was playing "gotcha!" by drawing a negative inference from the petitioner's failure to interrupt him earlier by answering a question not (yet) asked.

So the hearing itself was defective, not just the findings based on it, and there will have to be a new one. The point is not that the hearing was so defective that it deprived the petitioner of his liberty without due process of law, *Boci v. Gonzales*, 473 F.3d 762, 768 (7th Cir. 2007); compare *Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 540 (7th Cir. 2005); *Ahmed v. Gonzales*, 398 F.3d 722, 727-28 (6th Cir. 2005); *Al Khouri v. Ashcroft*, 362 F.3d 461, 467 (8th Cir. 2004), but simply that it was too unreliable to enable us to conclude that a determination of credibility based on it could be said to be supported by substantial evidence. *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1059 (9th Cir. 2005); cf. *Lin v. Ashcroft*, 385 F.3d 748, 749, 757-58 (7th Cir. 2004); *Uwase v. Ashcroft*, 349 F.3d 1039, 1045 (7th Cir. 2003); *Fiadjoe v. Attorney General of the United States*, *supra*, 411 F.3d at 163; *Secaida-Rosales v. INS*, *supra*, 331 F.3d at 312-13.

There is no need to invoke the Constitution when the immigration statute itself guarantees a fair hearing. 8 U.S.C. § 1229a(b)(4)(B) ("the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-

examine witnesses presented by the Government"); *Rehman v. Gonzales*, 441 F.3d 506, 508 (7th Cir. 2006) ("aliens have both statutory, and regulatory, entitlements to present all material evidence at impartial hearings. Any proceeding that meets these requirements satisfies the Constitution as well" (citations omitted)). The specific statutory right with which the immigration judge interfered in this case was the alien's right to "a reasonable opportunity . . . to present evidence."

Since we are ordering a new evidentiary hearing, there is no need to address the petitioner's additional grounds for relief—the denial of a motion for a continuance to enable him to obtain a lawyer and of a motion to reopen the administrative proceeding to enable him to present evidence that he was suffering from post-traumatic stress disorder that explained some of the inconsistencies in his testimony. These errors, if they were errors, are unlikely to recur in the further proceedings that we are ordering.

The petition for review is granted, the order of the Board of Immigration Appeals vacated, and the case returned to the Board for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*