# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-4107

ALBERT MUSOLLARI and VERGJINUSH MUSOLLARI,

*Petitioners,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A95-395-303 & A95-395-304

ARGUED SEPTEMBER 18, 2007—DECIDED SEPTEMBER 19, 2008

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Albert Musollari and his wife, Vergjinush, are natives and citizens of Albania who entered the United States in 2001 on visitor's visas. They overstayed and then sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") denied their

application, finding Musollari's testimony incredible, and the Board of Immigration Appeals ("BIA") affirmed. Because the decisions by the IJ and the BIA are supported by substantial evidence and the record does not compel a contrary conclusion, we deny the Musollaris' petitions for review.

## I. Background

The Musollaris came to the United States from Albania in January 2001 on visas that permitted them to stay for six months. They have two children: Kevin, who was born in Albania, was left behind and remains there; and David, who was born in the United States. The Musollaris did not return to Albania by their departure date and subsequently filed an application seeking asylum, withholding of removal, and protection under the CAT.[1] The petition was rejected by an asylum officer, and the Musollaris appeared before an IJ for removal proceedings. At the hearing Musollari recounted a history of hardships he said he and his family had suffered as a result of his involvement in Albanian politics. What follows is a summary of his testimony.

---

[1] Vergjinush Musollari's application was derivative of her husband's. *See* 8 U.S.C. § 1158(b)(3)(A) ("A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.").

Musollari served in the Albanian military during the final days of communist control in the early 1990s. In 1991 Musollari disobeyed a direct order from his superior officer to fire on a group of civilians who were attempting to flee the country by boat. Fearing reprisal for his disobedience, Musollari boarded the boat with the civilians; it was bound for Italy. Italian officials, however, returned Musollari and other soldiers to Albania, and upon their return he and the others were arrested and beaten by Albanian officials.

In 1992 the communist government fell and the Democratic Party, of which Musollari is a member, took power. That party's electoral superiority lasted until 1997 when the Socialist Party swept the elections. Musollari, however, claimed that the Socialists seized the reins of power "by force of arms," through violence and intimidation. He testified that he became a target of these tactics after he gave a speech at a protest rally in his hometown of Korcë. Musollari was forced to flee, and his home was ransacked during his absence. His neighbors told him the police, not random intruders, were the culprits.

Musollari was arrested in October 1997 and again in September 1998. He testified that he was beaten during these detentions and interrogated about his activities in the Democratic Party; he also said the police tried to force him to spy on other members of the party. The police arrested Musollari again in November of 2000, after he served as an election observer for the Democratic Party during elections the previous month. He claimed that in the course of his duties as an election observer, he wit-

nessed voting irregularities that enabled the Socialist Party to win the election. He testified that he was again interrogated about the Democratic Party's activities and threatened with violence against his family.

After this last incident, the Musollaris decided to flee Albania. They obtained nonimmigrant visas permitting them to come to the United States for six months, but were forced to leave their son, Kevin, behind. They arrived in the United States in 2001, overstayed, and sought asylum in 2002.

The Musollaris went before an IJ in the fall of 2003. The IJ denied their claims for asylum, withholding of removal, and protection under the CAT because he found Musollari's testimony incredible and lacking corroboration. Further, the IJ denied voluntary departure because he believed that Musollari was not of good moral character. The Musollaris appealed, and the BIA affirmed the IJ's decision except as to voluntary departure. The case was remanded to the IJ on that issue.

At the subsequent hearing before the IJ, the Musollaris withdrew their application for voluntary departure and instead sought to present new evidence on their claims. They did not state what the new evidence was, however. So the IJ denied the request and entered an order of removal. The Musollaris again appealed, and the BIA affirmed.

## II. Discussion

The BIA adopted the IJ's opinion, so we base our review on the IJ's analysis. *Balogun v. Ashcroft*, 374 F.3d 492, 498

(7th Cir. 2004). Our review of an order denying asylum based on a failure to prove eligibility is extremely deferential; "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 18 U.S.C. § 1252(b)(4)(B); *Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007); *Balogun*, 374 F.3d at 498 (holding that the IJ's findings may be overturned only if "the evidence *compels* a different result"). If an alien demonstrates eligibility, the Attorney General has discretion to grant or deny asylum. *Ghebremedhin v. Ashcroft*, 392 F.3d 241, 244 (7th Cir. 2004). "[T]he Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

The IJ's credibility determinations are also accorded substantial deference and should be overturned only "under extraordinary circumstances." *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006). Deference is not unlimited, however; the IJ's rulings cannot be based on "conjecture" or "insufficient or incomplete evidence" and instead "must be supported by specific, cogent reasons" which "bear a legitimate nexus to the finding." *Id.*

The Attorney General has discretion to grant asylum to an alien "refugee." 8 U.S.C. § 1158(b)(1)(A). A "refugee" is one who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The applicant

has the burden of proving eligibility for asylum, and the applicant's testimony alone may be sufficient to sustain the burden if the applicant's testimony is credible. 8 C.F.R. § 208.13(a). Refugee status may be proven in one of two ways. First, "if an applicant proves past persecution, a rebuttable presumption arises that the alien has a well-founded fear of future persecution." *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004); 8 C.F.R. § 208.13(b)(1). Second, an applicant may prove a well-founded fear of persecution by demonstrating his "fear is subjectively genuine and objectively reasonable in light of credible evidence." *Capric*, 355 F.3d at 1085; 8 C.F.R. § 208.13(b)(2). The subjective component "turns largely upon the applicant's own testimony and credibility," *Capric*, 355 F.3d at 1085, while the objective component requires the applicant to show that he will be singled out for persecution or that a group to which the applicant belongs is subject to a pattern or practice of persecution. 8 C.F.R. § 208.13(b)(2).[2]

---

[2] In order to obtain relief under 8 U.S.C. § 1231(b)(3) for withholding of removal, an applicant must "demonstrate a clear probability of persecution," which is a more demanding burden than that for asylum. *Balogun*, 374 F.3d at 508. Similarly, the standard for withholding of removal under the CAT is that it is "more likely than not" that the applicant will be tortured if returned. 8 C.F.R. § 1208.16(c)(2). This too is higher than the burden for asylum. *See Dandan v. Ashcroft*, 339 F.3d 567, 575 n.7 (7th Cir. 2003). Thus, if the petitioners failed to prove their claim for asylum because Musollari's testimony lacked credibility, the other claims must also fail.

Thus, asylum cases often turn on the IJ's credibility determination; an adverse credibility finding will doom the applicant's claimed eligibility as a "refugee" under either method of proof. "'A credibility analysis assesses the applicant's claim only for internal consistency, detail, and plausibility, typically demonstrated by background evidence concerning general country conditions, if available . . . .'" *Gjerazi*, 435 F.3d at 808 (quoting *Capric*, 355 F.3d at 1085); *see also* 8 U.S.C. § 1158(b)(1)(B)(iii).[3] Corroboration is generally not required to meet the petitioner's burden of proof unless the IJ finds the testimony not credible without it. *Capric*, 355 F.3d at 1085-86 & n.4 (discussing in which situations corroboration is required to meet petitioner's burden of proof); *see also* 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration.") (emphasis added).

In this case, the IJ found Musollari not credible, resting this determination on a number of factors, only some of which (as we will explain) are supported by the record. First, the IJ viewed Musollari's claim that he was interrogated and threatened after serving as an election observer with skepticism, saying such claims were extremely common amongst applicants from Albania. Relatedly, the

---

[3] Section 1158(b)(1)(B) was added by the REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3), and applies only to applications for asylum that were filed on or after May 11, 2005. *Id.* § 101(h)(2); *see also Oyekunle v. Gonzales*, 498 F.3d 715, 717-18 (7th Cir. 2007). Musollari's application was received on February 1, 2002.

IJ disbelieved Musollari's claim that the Socialist Party asked him in November 2000 to manipulate an election that had occurred the month before. The IJ also thought Musollari's arrests in 1997 and 1998 were not significant enough to warrant detailed consideration. Next, the IJ noted that Musollari's testimony about the Socialist Party seizing control of the government in 1997 through force and violence was "diametrically opposed" by information in country reports and other sources of historical data establishing that the Democratic government collapsed that year because of scandal and chaos associated with the failure of large "pyramid schemes." The IJ also faulted Musollari's failure to produce corroboration for his two arrests and the claimed ransacking of his home by the police. Finally, the IJ noted that Musollari conceded he lied to American officials about his purpose for coming to the United States in order to obtain a visa.

As we have noted, our review of the record reveals a number of mistakes in the IJ's reasoning. Musollari testified that he was an election observer in October of 2000 and was detained and threatened by police in November of 2000 based on this political activity. The IJ found this implausible based in part on his personal experience with Albanian asylum seekers—90% of whom, the IJ said, claim to have been Albanian election observers. The IJ was entitled, based on his experience adjudicating these claims, to question Musollari further on the details of his appointment and service as an election observer—and should have done so—but this in itself is an insufficient ground on which to rest an adverse credibility finding.

The IJ also erred in evaluating the reasons for Musollari's detention in November 2000. Musollari never claimed, as the IJ asserted, that Socialist Party agents asked him to manipulate the results of the previous month's election. Instead, he testified that they "wanted me to give all the information about the members of the democratic party or to our plans where [sic], and also tell the names of the democratic party." Demanding the names and locations of local Democratic Party members, as well as information about their planned activities, is not the same thing as attempting to coerce the manipulation of a vote that occurred a month earlier. The latter might be factually implausible; the former certainly is not. *See Cecaj v. Gonzales*, 440 F.3d 897, 898 (7th Cir. 2006) (noting that "[p]ersecution of [Albanian] Democratic Party activists during this period has been found in a number of cases"). Musollari's testimony on this point simply is not susceptible of the interpretation the IJ placed upon it.

Finally, the IJ inexplicably stated that Musollari had not claimed he was mistreated during his two detentions in October of 1997 and September of 1998, and therefore these arrests were not serious enough to warrant further consideration.[4] Musollari's testimony was directly to the contrary, however. He stated that in October 1997 a number of Socialist Party members attempted to

---

[4] The IJ also believed that the second arrest occurred in July 1998; in his brief Musollari calls this a "disturbing" mistake because he was "arrested and beaten in October of 1998." Based on our review of the record, both dates are incorrect. Musollari testified that the second arrest occurred on September 14, 1998.

engage Musollari in a debate while at a restaurant. Musollari refused to be drawn in and went home. Soon thereafter, the police came to his house and started beating him before taking him to the station. Once there, he testified, he was threatened with death and was also beaten with rubber sticks. Musollari also testified that he was arrested in September 1998 on false charges of having illegal firearms in his home. He was taken to a cell where police "us[ed] violence" against him and interrogated him about his involvement in the Democratic Party. The IJ either misunderstood or mischaracterized Musollari's testimony about his arrests.

Notwithstanding these mistakes, however, the balance of the evidence relied on by the IJ supports the adverse credibility determination. Most significantly—and this was emphasized by the BIA in affirming the IJ's decision—the IJ rightly noted that Musollari's testimony regarding the Democratic Party's loss of power in 1997 was wholly inconsistent with what is known to have occurred in Albania that year. Musollari testified that the Socialists seized control from the Democratic Party in a violent overthrow of the government. In reality, the government of the ruling Democratic Party was brought down by the collapse of large "pyramid schemes," which left thousands penniless. BUREAU OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, ALBANIA: PROFILE OF ASYLUM CLAIMS & COUNTRY CONDITIONS 3 (May 2001); THE EUROPA WORLD YEAR BOOK ONLINE, ALBANIA: COUNTRY PROFILE, RECENT HISTORY (Oct. 2003); COUNTRY INFORMATION & POLICY UNIT, U.K. BORDER AGENCY, ALBANIA ASSESSMENT ¶ 4.7 (July 2003). Members

of the Democratic Party were believed to be complicit in the pyramid schemes; civil and economic chaos followed, and the government used force in an attempt to put down the demonstrations. Representatives of both the Democratic and Socialist parties agreed to abide by the results of elections in June and July of 1997, which, as we have noted, the Socialists swept. BUREAU OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, ALBANIA: PROFILE OF ASYLUM CLAIMS & COUNTRY CONDITIONS 3 (May 2001); THE EUROPA WORLD YEAR BOOK ONLINE, ALBANIA: COUNTRY PROFILE, RECENT HISTORY (Oct. 2003).

Musollari attempts to minimize the stark differences between his testimony and the factual history by arguing that he simply gave "his impression about what transpired." But this sort of dramatic discrepancy between an asylum seeker's testimony and the established background facts may form the basis of an IJ's adverse credibility finding. *See Capric*, 355 F.3d at 1085. Although we have repeatedly cautioned against overreliance on generalized information in country profiles or State Department country reports, *see Oyekunle v. Gonzalez*, 498 F. 3d 715, 716 (7th Cir. 2007); *Dong v. Gonzales*, 421 F.3d 573, 578 (7th Cir. 2005), it is permissible for an IJ to contrast an asylum applicant's testimony with specific historical facts provided in a country report, *see Huang v. Gonzales*, 453 F.3d 942, 947 (7th Cir. 2006), and that is what the IJ did here.

Once Musollari's credibility was called into question, the IJ was entitled to consider the lack of corroboration for other aspects of his testimony. *See Capric*, 355 F.3d at 1085-

86 ("[I]f the IJ finds the testimony to be incredible, then a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence is required."); *see also Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006) ("[A]n IJ may disbelieve an applicant because she fails to provide corroborating evidence, and subsequently deny her claim."). Despite having nearly two and a half years to compile his case, Musollari presented no evidence to corroborate the core factual aspects of his claim: his arrests in 1997 and 1998—during which he testified that he was mistreated—or the ransacking of his house by the police in September of 1997. The IJ noted that corroborating testimony or affidavits from family or friends might reasonably have been obtained "insofar as Albania is not [now] experiencing any civil strife or war and that there are regular commercial contacts and mail contacts with that country."

Finally, the IJ relied on Musollari's admission that he gave false information to the American Embassy when applying for a travel visa. "Inconsistencies that do not relate to the basis of the applicant's alleged fear of persecution are less probative than inconsistencies that do." *Balogun*, 374 F.3d at 504; *see also Korniejew v. Ashcroft*, 371 F.3d 377, 383-84 (7th Cir. 2004) (finding that a discrepancy on a collateral matter cannot "form the basis for an adverse credibility finding" on its own). "Nevertheless, multiple misrepresentations to Agency officials can serve as *a factor* in the credibility calculus . . . ." *Balogun*, 374 F.3d at 504. Accordingly, although the errors in the IJ's analysis give us pause, we conclude that the evidence and sufficent "specific, cogent reasons" support the adverse

credibility finding; the record does not compel a contrary conclusion.

The Musollaris also challenge the IJ's refusal to hear new evidence on remand, but this argument is a nonstarter. They never explained to the IJ or the BIA what this new evidence might be, nor have they favored us with a description. Their failure to do so is fatal to the argument. *Rehman v. Gonzales*, 441 F.3d 506, 509 (7th Cir. 2006) ("[C]ourts do not set aside agencies' decisions unless mistakes cause prejudice, and how could we ascertain prejudice without an offer of proof or some substitute?"). The Musollaris' persistent failure to identify their "new evidence" leads to the inevitable conclusion that "there is nothing more to offer." *Id.* The petition for review must therefore be DENIED.

WILLIAMS, *Circuit Judge,* dissenting.  Because I would grant the Musollaris' petition for review, I respectfully dissent. As the majority acknowledges, there are significant flaws in the IJ's credibility determination. Most notably, the IJ completely ignored Albert Musollari's testimony that he was beaten on four occasions by police controlled by the Socialist Party, testimony that was central to Musollari's claim that he has been persecuted in the past.

In my view, this flaw alone renders the IJ's credibility determination defective. But even if the IJ's credibility determination could be supported by the reasons he provided (most of which were also defective), I submit that the reason relied upon by the majority does not justify an adverse credibility determination.

Musollari, a member of the Democratic Party in Albania, testified that he was imprisoned and beaten by members of the Socialist Party working for the government on four separate occasions. The first imprisonment, in 1991, lasted one week. Musollari was held in a cell with sixty to seventy other individuals, beaten regularly, and subjected to "psychotic pressure." The second imprisonment, in 1997, occurred after Musollari spoke out against what he believed to be fraudulent actions by the Socialist Party in the June and July 1997 elections (which the Socialist Party won). His house was ransacked and later he was taken from his home and held in prison for a day. A policeman put his boot on Musollari's neck and threatened to kill him, and he was visited in his cell every two hours by policemen who beat him with rubber sticks and told him they were going to punish him for organizing against the Socialist Party. The third imprisonment occurred in 1998, when Musollari was taken to the police station and put in a dark cell. His wrists were bound with barbed wire and he was beaten. The policemen interrogated him regarding his involvement with the Democratic Party and threatened him. The fourth imprisonment occurred in November 2000, when because of Musollari's refusal to help the Socialist Party during the October elections,

policemen arrested him at a Democratic Party meeting and held him all day, threatening his wife and child. All of these incidents occurred when the Socialist Party was the majority party in government.

Inexplicably, in his order denying asylum, the IJ made no mention whatsoever of any of the physical mistreatment that Musollari suffered during his prison visits. In fact, the IJ went so far as to state, several times, that Musollari did not allege he was mistreated during the 1997 and 1998 detentions. For example, he stated, "I don't think that the brief detention on [sic] October of 1997, even if credible, is important to the respondent's claim, *insofar as he was not mistreated* and was released after only one day." (Emphasis added.) He also expressed the following comment regarding the same imprisonment: "He was held all day but released the following day without charge. *He makes no contention that he was mistreated during his detention.*" (Emphasis added.) Regarding the 1998 imprisonment, the IJ stated only that his assessment was the same as his assessment of the 1997 imprisonment: "That he was held only for a brief time. There was an accusation that he was harboring illegal firearms and then released."

In my view, these comments demonstrate a critical defect in the IJ's credibility determination. Musollari's asylum application is based on his fear of persecution by the Socialist Party upon his return to Albania, which means his testimony regarding these beatings is central to his claim. The IJ's comments reveal that he simply ignored Musollari's testimony on this matter. This is something

the IJ is not permitted to do, and we have overturned credibility determinations in similar cases. *See, e.g., Adekpe v. Gonzales,* 480 F.3d 525, 530 (7th Cir. 2007) ("We must affirm the IJ's decision unless it is not supported by substantial evidence . . . or unless the IJ ignored probative evidence."); *Tolosa v. Ashcroft,* 384 F.3d 906, 909 (7th Cir. 2004); *see also Agbor v. Gonzales*, 487 F.3d 499, 504 (7th Cir. 2007); *Nakibuka v. Gonzales*, 421 F.3d 473, 477 (7th Cir. 2005) ("The testimony that the IJ ignored was central to Nakibuka's claim of persecution."); *compare Iglesias v. Mukasey*, No. 07-2910, 2008 WL 3877302, at *3 (7th Cir. Aug. 22, 2008) ("a claim that the BIA has completely ignored the evidence put forth by a petitioner is an allegation of legal error").

Given the IJ's treatment of Musollari's uncontradicted evidence regarding the basis for his claim, I do not think the IJ's credibility determination is salvageable. But despite this critical error, the majority upholds the IJ's adverse credibility determination because Musollari's description of events in 1997 does not comport with what is known to have occurred in Albania during that year. However, that testimony, albeit inaccurate, is tangential to his claim and therefore does not discredit his claim.

To begin, I am not sure Musollari's description of the election in 1997 is diametrically opposed to the report relied upon by the IJ in his determination. Musollari testified that the Socialist Party won the election "by using the force of the weapons and by corruption." The report states that election campaigning for the 1997 election was "marred by violence" and despite the presence of

the Multinational Protection Force (which had been sent to Albania by the United Nations to restore civil order in April 1997) three people were reportedly killed in violent incidents during the voting. It is true that Musollari did not mention the Pyramid Scheme which caused the civil unrest in early 1997, and it is also true that the results of the 1997 election were certified as having been satisfactorily conducted. But it is not clear to me from the transcript that Musollari was actively lying about what happened. At worst, Musollari's description was an exaggeration of those events told from the perspective of someone who affiliated himself with the losing party in those elections.

Of course, an adverse credibility determination can be supported by a finding that a petitioner is exaggerating about something but it depends on the context in which the petitioner is offering the information at issue. *See Hanaj v. Gonzales*, 446 F.3d 694, 700 (7th Cir. 2006) ("An IJ must analyze inconsistencies against the backdrop of the whole record, as one factor in the overall credibility determination."); *Balogun v. Ashcroft,* 374 F.3d 492, 504 (7th Cir. 2004) ("Inconsistencies that do not relate to the basis of the applicant's alleged fear of persecution are less probative than inconsistencies that do.").

Even if Musollari's description of the events of 1997 was completely inaccurate, Musollari was not asked to provide a factually correct history of Albania in 1997. Rather, he described the events that transpired in Albania in 1997 to provide the background for one of his alleged beatings by the Socialist Party. His description of the

events of 1997 was in response to his counsel's question, "How did this 'suffering' begin *for you?*" and "What, if anything, in particular happened *to you* in July of 1997?" (Emphasis added.) His suffering was driven by his perspective; because Musollari believed that the 1997 elections were corrupt, he spoke out against the Socialist Party, which resulted in his 1997 imprisonment and beating.

We have held on many occasions that for an inaccuracy or falsehood to provide an adequate basis for an adverse credibility finding, that inaccuracy must go to the "heart" of the petitioner's claim for asylum. *Adekpe*, 480 F.3d at 531 (7th Cir. 2007); *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005); *Hanaj*, 446 F.3d at 700; *Capric v. Ashcroft*, 355 F.3d 1075, 1090 (7th Cir. 2004) (quoting cases for the proposition that minor inconsistencies or omissions will not support an adverse credibility finding); *Korniejew v. Ashcroft*, 371 F.3d 377, 383-84 (7th Cir. 2004) (petitioner's factual inaccuracy was not the "linchpin" of her asylum claim). It bears noting that even after the passage of the Real ID Act (which does not affect this claim), we have held that the IJ still must consider the purported inaccuracy within the context of all relevant factors. *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007) ("[Under the Real ID Act], [t]he immigration judge may consider inaccuracies or falsehoods that do not go to the heart of the asylum applicant's claim, but he can do so only as part of his consideration of 'the totality of the circumstances, and all relevant factors.'").

I would follow these cases here because Musollari's impression of the 1997 elections does not go to the heart

of his claim. When viewed in the context of the entire hearing, Musollari's description of the events that transpired in Albania in 1997 is entirely peripheral to his claim, which is that he fears returning to Albania because he was beaten by members of the Socialist Party working for the government on four separate occasions.

Furthermore, the point Musollari was making is that he was beaten for expressing his opinion about the 1997 elections and the Socialist Party. The truth of his opinion is not relevant—it matters only whether he became a target of violence based on his beliefs. That Musollari's impression of how the Socialist Party gained power in 1997 differs from historically known facts has no bearing on whether he was beaten by the Socialist Party, nor does it reveal anything about his fear for his safety. The IJ does not explain otherwise. *See San Kai Kwok v. Gonzales,* 455 F.3d 766, 771 (7th Cir. 2006) (whether petitioner had a "bona fide relationship" with her husband had no bearing on whether she was subjected to an involuntary abortion, and the IJ did not explain his reasoning to the contrary).

Without addressing Musollari's testimony that he was beaten and how that might relate to his impression of historical events, a credibility determination based on that impression alone bears no connection to Musollari's claim. Indeed, if Musollari is telling the truth that he was beaten by the Socialist Party for speaking out about the elections in 1997, it might explain his colored perception of the elections.

Ultimately, the IJ never made a credibility determination as to the key issue of whether Musollari's fear of

persecution is credible. Had he relied on Musollari's inaccurate description of events to find that everything Musollari said (including his testimony regarding the beatings) was false, I think this might be a different case. But the IJ does not connect this factual inaccuracy to Musollari's claim. In my view, this gap in the IJ's reasoning cannot be fixed unless the IJ properly considers Musollari's testimony that he was beaten and deems it credible or incredible. That is the testimony that goes to the very heart of his claim and the fact that the IJ completely disregarded it taints the entire determination. *Cf. Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) ("[H]aving found that the other five reasons given by the IJ for discrediting [the petitioner] are either unsupported by the evidence in the record or based on incomplete or improperly excluded evidence, we are not inclined to defer to his credibility determinations on this remaining sixth ground alone.").

I express no opinion as to the ultimate merits of Musollari's asylum claim or as to his credibility. But because the IJ's decision completely ignored testimony that goes to the heart of the asylum claim, I submit that such a determination cannot be saved by reliance on tangential inaccuracies. I would grant the petition for rehearing.